*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0399p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LANCINE KABA,

*Petitioner,*

v.

No. 07-3862

MICHAEL MUKASEY, Attorney General,

*Respondent.*

On Petition for Review from the
Board of Immigration Appeals.
No. A97 105 318.

Submitted: July 31, 2008

Decided and Filed: November 13, 2008

Before: DAUGHTREY and McKEAGUE, Circuit Judges; VAN TATENHOVE, District Judge.[*]

---

## COUNSEL

**ON BRIEF:** David C. Koelsch, UNIVERSITY OF DETROIT MERCY, Detroit, Michigan, for Petitioner. Patrick James Glen, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

## OPINION

---

MARTHA CRAIG DAUGHTREY, Circuit Judge. The petitioner, Lancine Kaba, seeks review of the denial by an immigration judge and by the Board of Immigration Appeals (BIA) of his requests for asylum, withholding of removal, and relief pursuant to the United Nations Convention Against Torture, 1465 U.N.T.S. 85, 23 I.L.M. 1027, art. 3. Before this court, Kaba contends that the immigration judge erred in finding him not credible, in concluding that he had not suffered past persecution in his native Cote d'Ivoire (formerly known as the Ivory Coast), and in refusing to recognize his well-founded fear of future persecution there. Because we conclude that the evidence in the administrative record does not compel a conclusion contrary to that reached by the immigration judge, we hold that the petitioner has failed to establish his eligibility for the relief he seeks. We therefore affirm the administrative decision and deny the petition for review in this matter.

---

[*]The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## *FACTUAL AND PROCEDURAL BACKGROUND*

Petitioner Kaba, a native and citizen of Cote d'Ivoire, entered the United States on July 7, 2000, on a valid F-1 student visa with the intent to pursue studies at Michigan Technological University. When Kaba ceased attending college in December 2002, however, the Immigration and Naturalization Service, now the Department of Homeland Security, determined that the petitioner was subject to removal and ordered him to appear before an immigration judge to show cause why he should not be removed from the United States. At that proceeding, Kaba conceded removability but indicated his desire to apply for asylum, withholding of removal, and relief under the United Nations Convention Against Torture.

However, Kaba's first application, filed with the administrative agency in 2003, did not list any specific instances of past persecution or torture. Instead, he claimed merely that "[m]y family is from the north of Ivory Coast and is Muslim and belongs to the Dioula ethnic group. As a result, my family has been threatened by the government and forces loyal to the government." The record shows, however, that despite the fact that his ethnicity could be traced to northern Cote d'Ivoire, Kaba and his family were actually residents of the country's largest city, Abidjan, located on the southern coast. It was there that Kaba was born, reared, and attended school from 1987-1999.

Kaba filed an amended application in 2004, in which he claimed without explanation that he would be tortured should he return to Cote d'Ivoire and also asserted:

> My family has been completely uprooted by the political, ethnic and religious violence in Ivory Coast. My family was forced to flee their home in Abidjan and I have not heard from them for many months. I believe that they are in a rebel-controlled area of the country but I do not know where or in what conditions they are living.

This contention appears to have been based on the failed coup in Cote d'Ivoire in September 2002 that effectively split the country in two, with pro-government forces holding the southern half of the country – where Kaba's family lived – and rebel forces holding the northern section. According to the State Department 2005 country report, which was introduced into the administrative record, a period of political instability took root as a result of turmoil caused by the uprising, which led to various kinds of human rights abuses in both parts of the country, including (but not limited to) "arbitrary and unlawful killings by security forces, progoverment militias, and student groups"; torture and inhumane punishment by those same groups; illegal arrests and lack of public trial; "deplorable prison and detention center conditions"; police harassment of non-citizen Africans; restrictions on speech and assembly; trafficking and forced labor; and violence against women. Conditions in the north were reported to be worse than those in the south.

But nowhere in the long list of human rights abuses is there any indication that discrimination on the basis of religion was widespread. The 2005 country report suggests that immediately after the 2002 rebellion, the government "targeted persons perceived to be perpetrators or supporters of the rebellion, who often were Muslim" but notes that "[s]trong efforts by religious and civil society groups have helped prevent the crisis from becoming a religious conflict" and that the "targeting of Muslims suspected of rebel ties diminished somewhat during [2002]." The only form of outright discrimination reflected in the report concerned "northern Muslims" who "shared names, style of dress, and customs with several of [Cote d'Ivoire's] predominantly Muslim neighboring countries" and who were sometimes "accused wrongly of attempting to obtain nationality cards to vote or otherwise take advantage of citizenship," thereby "creat[ing] a hardship for a disproportionate number of Muslim citizens." Again, there is no indication that Ivorian Muslims were persecuted because of their religion rather than because of political activity, or that they suffered religious persecution rather than "hardship" of the kind described in the country report.

Eventually, a hearing was held before an immigration judge, at which both the petitioner and his brother, Ousseinou Kaba, testified. Petitioner Lancine Kaba testified that he was then 25 years of age and was one of six children born to an Ivorian mother and to a father who was himself born in neighboring Guinea. He further explained that his family was Muslim and from the Dioula ethnic group, thus purportedly inviting derision and harassment from what he described as the overwhelmingly Christian and anti-Muslim population in the southern part of the country where the Kabas resided.

The petitioner further testified that his father held a computer engineering consulting position with the African Development Bank in the capital city of Abidjan. Still, according to Kaba, his family was subjected to numerous indignities because they were Muslim, Dioula, and descended from a non-Ivorian father. For example, the petitioner claimed that his oldest sister was routinely ridiculed by others for wearing a head-scarf indicative of her adherence to Islam. He explained that he himself had his government identification card confiscated in 1999 because of his Muslim-sounding name, although he was later issued a new, permanent identification document. Likewise, the petitioner said, he was initially thwarted in his attempts to obtain a passport because his father was not a native Ivorian. Eventually, however, that document too was issued to the petitioner. Finally, Kaba recounted difficulties he experienced in attempting to retrieve from the Abidjan post office certain documents sent to him in connection with his application to Michigan Tech. According to the petitioner's testimony, such difficulties arose simply because of the postal clerk's recognition of the Muslim origin of his name and her resulting demand that he produce national identification that he did not possess. That matter was resolved only after Kaba's father agreed to pay the clerk to release the petitioner's mail.

Significantly, the petitioner referred to this collection of problems as "harassments." In his own words, he admitted:

> But it wasn't to a point where it was persecution yet. It was something I could deal with, you know, I was leaving the country for school, so it wasn't for, to me something really big. Plus, it wasn't every, everywhere, so I didn't, didn't feel the need to. Plus I was coming to school here.

Kaba also testified about a 1999 confiscation by the police of his father's automobile, allegedly because his father was not a native Ivorian. Again, however, no lasting harm resulted from that interaction with government representatives given the fact that the vehicle was returned to its owner less than one week later in exactly the same condition in which it had been when taken.

Finally, the petitioner recounted what he had learned about an incident that occurred on July 22, 2005, in Abidjan in which his brother Ousseinou was purportedly detained by government police simply because his identification card revealed his Muslim name. According to consistent testimony offered by both the petitioner and his brother, the police jailed Ousseinou overnight, placed him in a cell with other young Muslim men, and beat and kicked him. Ousseinou also claimed that the beating resulted in him suffering two cracked teeth and sustaining a wound over his eye. Moreover, Ousseinou testified that when he was released from custody the following morning, he saw his father at the police station and noticed that the father had also been incarcerated and beaten by the police after arriving at the police station to free his son. Ousseinou Kaba also mentioned in his testimony that he had been detained by police on two occasions prior to the July 22, 2005, incident. In both of the prior "arrests," however, the authorities merely checked Ousseinou's identification documents and then released him unharmed after approximately 30 minutes.

After the petitioner rested his case before the immigration judge, the government recalled the petitioner to the stand. During the questioning that followed, the attorney highlighted Ousseinou's testimony that the petitioner had maintained consistent e-mail contact with his family

and that the family had remained in Abidjan despite some harassment by non-Muslims. In light of that testimony, the petitioner was asked to explain his assertion in the amended asylum application that his "family was forced to flee their home in Abidjan" and that he had "not heard from them for many months." In attempting to do so, the petitioner engaged in the following exchange with the government lawyer:

> A. Well, what happened is that when the situation went back in there, I stopped having contact from my dad. There was a time when there was a hurricane, somewhere in Miami or whatever, in Florida, and at the African Development Bank, all the (indiscernible) system and everything is outside of the country. It's (indiscernible). So, I wasn't in touch with my dad or anybody for awhile, for at least a month or two months. It was around that period.
>
> Q [from the immigration judge]. For how many months?
>
> A. A month or two. So, at that time, I didn't have any contact with anybody, the phone lines were down because they are always down once there is a rebel attack or anything. So, I wasn't in touch with them for awhile, and I honestly thought that they left the country or they run [sic] away.
>
> Q [from the government lawyer]. And what time was this? What time period? What month?
>
> A. Well, I really don't remember. I really don't remember.
>
> Q. You stated that you believed that they were living in a rebel-controlled area of the country. Why would you have that belief, sir?
>
> A. Because, initially, I would have thought that would be the first place they will head if they had to leave Abidjan. There is no other way to go. If we are pushed by Christian [sic], we will have to go to the rebel north.
>
> Q. Okay, so you have no information –
>
> A. I had no information. I assumed they were on their way.
>
> Q. -- that they had actually fled –
>
> A. Yeah.
>
> Q. -- Abidjan?
>
> A. I didn't have any, I just couldn't get in touch with them.

At the conclusion of the petitioner's testimony and the closing arguments of counsel, the immigration judge delivered her oral decision in the matter. That decision summarized the testimony and documentary evidence introduced before the court, discussed the relevant case law, statutes, and regulations, and ultimately concluded that Kaba was not entitled to the relief he sought. Specifically, the immigration judge noted her "concerns regarding [Kaba's] credibility, particularly as it relates to omissions in his written application when compared to his and his brother's testimony." She then highlighted the general and vague nature of the petitioner's complaints and the failure of the applications to make reference to "any specific incidents of mistreatment or harassment that he or his family incurred." The immigration judge next pointed to the fact that Ousseinou Kaba had testified that he had been arrested three times by the police even though

Lancine Kaba mentioned only one such arrest in his own testimony and used that fact, as well as the fact that Ousseinou did not mention an injury to the bridge of his nose when describing the beating he received in jail, to find the brother's testimony incredible. Discussing the petitioner's mistaken assumption that his family had fled their Abidjan home, the immigration judge also found Lancine Kaba not credible and unable to "sustain his burdens of proof and persuasion necessary to establish eligibility for asylum, withholding of removal under the Act, or withholding under the Torture Convention."

Alternatively, the immigration judge determined that, even if the petitioner were found to be credible, no relief was justified because Lancine Kaba suffered only "a few isolated incidents of harassment" and not past persecution in Cote d'Ivoire. Furthermore, the court found that the administrative record did "not clearly establish a nexus on which this Court could find that any of the harm that [Kaba] underwent, or his family underwent, was due to a protected ground." Finally, because the immigration judge considered the petitioner's family to be part of what the country report described as Cote d'Ivoire's "Islamic urban elite," because the report also indicated increased interfaith understanding in the country, and because any potential harm to the petitioner could be attributed to general violence in the country rather than to specific government oppression, she ruled that the petitioner could not establish a well-founded fear of future persecution or torture should he be removed to his native land.

The BIA summarily dismissed Kaba's appeal, agreeing with the immigration judge that the petitioner failed to establish through credible testimony that he had suffered past persecution in his homeland. Alternatively, the BIA noted that, "even if [Kaba's] testimony were to be found generally credible, he did not establish eligibility for relief."

### *DISCUSSION*

**Standard of Review**

When, as in this case, the BIA summarily affirms a portion of the decision of an immigration judge without an in-depth discussion of the relevant issues, "we review the [immigration judge's] decision as the final agency decision." *Denko v. INS*, 351 F.3d 717, 726 (6th Cir. 2003). That administrative ruling must be sustained if the determination is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). "Under this deferential standard, we may not reverse the Board's or the immigration judge's determination simply because we would have decided the matter differently." *Koliada v. INS*, 259 F.3d 482, 486 (6th Cir. 2001) (citing *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998)). Rather, to overturn such a factual determination, "we must find that the evidence not only *supports* [a contrary] conclusion, but *compels* it." *Elias-Zacarias*, 502 U.S. at 481 n.1.

**Request for Asylum**

Before the immigration judge and the BIA, Kaba requested that he be granted asylum in the United States. As we have explained, "[R]esolution of any request for asylum involves 'a two-step inquiry: first, whether the petitioner is a "refugee" within the meaning of the [Immigration and Nationality Act], and second, whether the petitioner merits a favorable exercise of discretion by the Attorney General.'" *Chen v. Gonzales*, 447 F.3d 468, 472 (6th Cir. 2006) (quoting *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994)). *See also INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.5 (1987); 8 U.S.C. § 1158(b)(1).

Section 1101(a)(42)(A) of title 8 of the United States Code defines the term "refugee" to mean:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

"An applicant who has been found to have established . . . past persecution shall also be presumed to have a well-founded fear of persecution on the basis of the original claim," 8 C.F.R. § 208.13(b)(1), unless the immigration judge finds, by a preponderance of the evidence, either that:

> (A) There has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality . . . on account of race, religion, nationality, membership in a particular social group, or political opinion; or
>
> (B) The applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . and under all the circumstances, it would be reasonable to expect the applicant to do so.

8 C.F.R. § 208.13(b)(1)(i).

Kaba is unable in this case to invoke the presumption of a well-founded fear of *future* persecution that arises, pursuant to 8 C.F.R. § 208.13(b)(1), from the establishment of *past* persecution. Even though applicable statutes do not define the term "persecution," we have determined that "'persecution' within the meaning of 8 U.S.C. § 1101(a)(42)(A) requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch*, 146 F.3d at 390. Here, Kaba conceded in his own testimony before the immigration judge that he did not personally suffer any "persecution" during his time in Cote d'Ivoire. He was not arrested, beaten, or otherwise physically mistreated prior to coming to the United States in 2000. Rather, any inconveniences he was made to suffer, allegedly as a result of his Muslim name or his father's foreign heritage, were termed mere "harassments," not acts of persecution. Consequently, in order to establish his refugee status for purposes of obtaining a discretionary grant of asylum, Kaba must show that he now possesses a well-founded fear of future persecution should he return to the country of his birth.

In analyzing whether Kaba possessed a well-founded fear of future persecution in Cote d'Ivoire, the immigration judge first discounted such an apprehension based upon her conclusion that the petitioner's testimony and other testimony offered on his behalf was not credible. In part, those credibility determinations were premised upon the facts that: (a) Kaba did not list specific instances of alleged persecution in his asylum application and amended asylum application; (b) the petitioner's brother testified that he (Ousseinou) had been detained by Ivorian police three times, yet mentioned to Lancine only the one July 2005 arrest during which Ousseinou was kicked and beaten; (c) Ousseinou testified about an injury to the bridge of his nose suffered during that beating only upon direct questioning from the immigration judge; and (d) the petitioner's application falsely stated that his family had been uprooted by anti-Muslim militia and forced into hiding in the anarchic northern portions of the country.

An immigration judge's credibility determination is considered a finding of fact and is thus reviewed under the deferential substantial-evidence standard. *See Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). Even so, the immigration judge's conclusion must be supported by specific reasons and must be based upon issues "that go to the heart of the applicant's claim." *Id.* at 926. In other

words, "[i]f discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." *Id.* (citations and internal quotation marks omitted).[1]

In this matter, the immigration judge's reliance upon perceived defects in *Ousseinou* Kaba's testimony to conclude that *Lancine* Kaba was not a credible witness is unpersuasive. Ousseinou's failure to inform his brother that he had twice been detained for 30 minutes or less while authorities examined his identification documents, and Ousseinou's failure to list a cut to his nose that resulted from a beating that also produced two cracked teeth and a gash above his eye only arguably suggests an "attempt[ ] by the applicant to enhance his claims of persecution." In our opinion, the immigration judge attached undue significance to those two "discrepancies" in her credibility determination.

In arriving at her decision concerning the petitioner's credibility, the immigration judge also focused upon the vague allegations of persecution in Kaba's applications and upon his bold assertions about supposed conditions in Cote d'Ivoire. In a split decision in *Liti v. Gonzales*, 411 F.3d 631, 638 (6th Cir. 2005), we concurred in the Second Circuit's recognition in *Secaida-Rosales v. INS*, 331 F.3d 297, 308 (2d Cir. 2003), *abrogated, in part, by statute as recognized in Lin v Mukasey*, 534 F.3d 162, 164-64 (2d Cir. 2008), that "the circumstances surrounding the application process do not often lend themselves to a perfectly complete and comprehensive recitation of an applicant's claim to asylum or withholding, and . . . holding applicants to such a standard is not only unrealistic but also unfair." The *Liti* majority then explained:

> The purpose of holding a removal hearing is not simply to reiterate the statements made in the asylum application, but rather to allow an alien "to present evidence on the alien's own behalf" *including to elaborate on the generalized claims made in the application itself.* 8 U.S.C. § 1229a(b)(4)(B). Therefore, because the statements in the application were not inconsistent with the [petitioner's] subsequent testimony of the specific events at [his] removal hearing, we conclude the BIA's adverse credibility finding is unsupported by the evidence, and therefore we are compelled to conclude to the contrary.

*Liti*, 411 F.3d at 639 (emphasis added).

Thus, the mere failure of a petitioner to include every detail of an asylum claim in the application itself should not be considered fatal to a petitioner's request for relief.[2] On the other hand, an application should contain at least some indication of the type of assertions that will be made in support of a claim. Kaba's complete lack of specificity in both his original and amended applications justifies the immigration judge's skepticism about the validity of those claims in this matter.

---

[1] The REAL ID Act, Pub. L. No. 109-13, 119 Stat. 302 (2005), now permits an immigration judge to base an adverse credibility finding on inconsistencies, inaccuracies, or falsehoods "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii). That provision, however, applies only to applications for asylum, withholding, or other relief made on or after May 11, 2005, the effective date of the enactment. Although the handwritten date on Kaba's initial asylum application is illegible, that document bears two different date stamps from 2003, well before the effective date of the REAL ID Act.

[2] In considering applications filed after May 11, 2005, "a trier of fact may base a credibility determination on the . . . consistency between the applicant's . . . written and oral statements." 8 U.S.C. §1158(b)(1)(B)(iii). Even so, such a determination must take into account "the circumstances under which the statements were made." *Id.* Thus, as long as statements in an application are not inconsistent with oral testimony, mere lack of specificity in an application, compared with more detailed testimony at an evidentiary hearing, will not provide support for a finding that a petitioner is not credible.

Moreover, one bold, otherwise unqualified statement of the petitioner in his amended application inevitably calls Kaba's credibility into question. This overstatement concerns the petitioner's baseless assertion that the Kaba family had been "completely uprooted by the political, ethnic and religious violence in Ivory Coast" and "forced to flee their home in Abidjan," from which he purportedly concluded that "they are in a rebel-controlled area of the country" and that their exact whereabouts and living conditions were completely unknown to him. Given his later testimony at the hearing that this allegation was based on nothing more than a temporary interruption in his e-mail contact with his family, the exact timing of which he was unsure, the immigration judge could reasonably assume that the statement was reckless, if not a deliberate falsehood. Testimony from Kaba's brother indeed indicated that the family was never driven from their home and that the petitioner's relatives remained in Abidjan throughout the duration of their son's sojourn in the United States. Because the treatment of the family was, moreover, a critical component of Kaba's claim of persecution, the blatant overstatement of the dangers faced by his relatives could be considered indicative of the petitioner's untruthfulness regarding additional matters of import during the hearing.

Even if the immigration judge had found Kaba to be a credible witness, however, the evidence in the record does not compel a conclusion that the petitioner did indeed possess a well-found fear of future persecution in Cote d'Ivoire. According to the record, Kaba does not consider himself to have been persecuted during his time in his native land. Although he did experience problems that he presumed would not have occurred had he not been Muslim, the petitioner candidly referred to such encounters as instances of harassment, not persecution. It follows that the immigration judge was not incorrect in concluding that Kaba had not demonstrated that he was likely to face persecution upon return to Cote d'Ivoire. Consequently, the evidence does not compel the opposite result, as required for this court to reverse the administrative decision on Kaba's petition for asylum.

Kaba also petitioned this court for review of the administrative denial of his request for withholding of removal. Before this court, however, the government, citing our prior decision in *Gilaj v. Gonzalez*, 408 F.3d 275, 289 (6th Cir. 2005), argues that we have no jurisdiction over this claim because the petitioner "presented no argument before the Board with respect to" this issue and thus failed to exhaust his administrative remedies. Despite seeking to rely upon the legal principles espoused in *Gilaj*, the Attorney General has nevertheless failed to read that case carefully. In *Gilaj*, we stated:

> Petitioners argued before the BIA that the [immigration judge] had erred in finding that the incidents described by the petitioners did not constitute persecution. Their argument is pertinent to both the claim for asylum and the claim for withholding of removal. Accordingly, we find that petitioners properly presented the issue of withholding of removal to the BIA for its determination. In addition, petitioners presented the issue to this court by arguing in their appellate brief that the [immigration judge] and the BIA had abused their discretion by denying both the claim for asylum and the claim for withholding of removal. Accordingly, petitioners have not waived their claim for withholding of removal, and we have jurisdiction to hear the claim.

*Id.*

Similarly, in this matter, Kaba argued – somewhat inartfully – before the BIA that he had been subjected to past persecution in Cote d'Ivoire and, consequently, was entitled to both asylum and withholding of removal. Indeed, the petitioner specifically claimed:

Mr. Kaba has thus shown that he will, more likely than not, be persecuted if returned to the Ivory Coast and is therefore entitled to withholding of removal. He has also shown that he will more likely that [sic] not, be tortured if returned to the Ivory Coast and is therefore entitled to CAT relief. Mr. Kaba also would not be able to reasonably relocate to another part of the country to avoid persecution. *A fortiori*, he has met the lower standard of asylum by showing that his fear of persecution is reasonable.

The claim for withholding of removal was thus properly exhausted and this court has jurisdiction over this allegation of error.

In order to qualify for withholding of removal, the petitioner "must establish that there is a clear probability that he will be subject to persecution if forced to return to the country of removal." *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004). To make such a showing, a petitioner "must demonstrate that 'it is more likely than not' that he or she will be persecuted upon return." *Liti*, 411 F.3d at 641 (quoting 8 C.F.R. § 1208.16(b)(2)). Because this burden is "a more stringent burden than what is required on a claim for asylum," *id.* at 640 (quoting *Pilica*, 388 F.3d at 951), it follows from Kaba's failure to establish eligibility for asylum that he also cannot satisfy the more onerous burden for withholding of removal. *See, e.g.*, *Koliada*, 259 F.3d at 489.

The petitioner additionally requested relief under the provisions of the United Nations Convention Against Torture. To obtain withholding of removal under that convention, "[t]he burden of proof is on the applicant . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). This burden is also significantly greater than the burden required to demonstrate eligibility for asylum. Whereas asylum may be granted by the attorney general upon a showing of a "well-founded fear of persecution," withholding of removal under the Convention Against Torture requires a showing that it is more likely than not that Kaba would not only be persecuted upon his return to Cote d'Ivoire, but that he would be tortured. Because the petitioner cannot demonstrate entitlement to a grant of asylum, he also cannot meet the more stringent requirements of the Convention Against Torture. *See, e.g.*, *Liti*, 411 F.3d at 641. Substantial evidence thus supports the immigration judge's denial of this extraordinary relief.

## *CONCLUSION*

For the reasons set out above, we DENY the petition for review.