NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0704n.06

No. 09-3120

FILED
**Oct 29, 2009**
LEONARD GREEN, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

RUSLI DARWIS,

      Petitioner,

v.

ERIC H. HOLDER, JR.,

      Respondent.

ON APPEAL FROM THE BOARD OF
IMMIGRATION APPEALS

———————————————————— /

BEFORE:    GUY, CLAY, and WHITE Circuit Judges.

    **CLAY, Circuit Judge.**  Petitioner Rusli Darwis appeals the order of the Board of

Immigration Appeals ("BIA"), affirming the immigration judge's denial of his motion for asylum,

withholding of removal, and protection under the Convention Against Torture ("CAT"). On appeal,

Darwis only challenges the denial of his motion for withholding of removal. For the following

reasons, we **DENY** Darwis' petition for review.

## STATEMENT OF FACTS

    Darwis, a native and citizen of Indonesia, arrived in the United States on February 19, 2005

as a nonimmigrant B-2 visitor with rights to stay in the United States for six months. On May 18,

2006, the Department of Homeland Security issued a Notice to Appear charging Darwis under 8

U.S.C. § 1227(a)(1)(B) for remaining in the country longer than permitted. Darwis appeared at a

hearing on June 14, 2006, admitted the allegations and conceded removability. Indonesia was

designated as the country of removal. Darwis submitted an application for asylum, withholding of removal, and CAT protection on September 6, 2006.

A hearing was held before an Immigration Judge on February 9, 2007. At the hearing, Darwis testified that he was a native and citizen of Indonesia and a member of the Madura tribe. That tribe has a long history of conflict with the Dayak people. Darwis lived in the Kalimantan region and used to live and work in the city of Sambas. He alleges that Dayaks regularly attack Madurese in the area. Darwis was the witness to two such large-scale attacks. When he was a supervisor at a metal processing plant in Sambas, one hundred Dayaks attacked the Madurese working at the plant with spears, arrows and machetes. While Darwis emerged unscathed, he knew people who were killed in the attack. Another time, the Dayaks attacked Darwis' mosque killing those who were unable to flee the mosque. Darwis also saw a Madurese acquaintance of his killed in broad daylight by a Dayak arrow. Darwis testified that he did not know of any arrests as a result of these attacks. He went to the police for help once and was ordered to leave the station. Darwis describes the situation in 2001: "The Dayak killed many Madurese and robbed and burned Madurese businesses. They treated my people savagely. They would shoot people with arrows or kill them with machetes. They would decapitate people and run around with their victim's heads." (J.A. at 187). Darwis testified that he was never beaten, arrested, kidnaped or held hostage by the Dayaks.

Darwis left Sambas and moved to first Surabaya and then Jakarta because he "was chased by these Dayaks." (J.A. at 61).[1] He spent four years in these two cities. He testified that he was in danger in both cities but acknowledged that he had no problems with any members of the Dayak

---

[1]In his application for asylum, Darwis says that his work, and not a need to flee the Dayak, brought him to Surabaya and then to Jakarta. (J.A. at 188).

tribe in either city. Darwis testified that the Dayak may target him because he "was a leader" and "would provoke the other Maduras to fight back." (J.A. at 62). His status as a leader stems from his role as a supervisor at the metal processing plant.

Darwis further testified that he came to the United States to save himself. He has family back in Indonesia that he testified would be in danger "if the Dayak knows." (J.A. at 63). Presumably, he means if the Dayak knows that the family is related to Darwis. He fears returning to Indonesia because he might be killed and states that he would not be safe any place in the country.

Darwis has supported his contention of violence in the Kalimantan region with multiple outside reports. The BIA acknowledged that "there is evidence that relations between Madurese and indigenous Dayaks remain poor (at least in central and western Kalimantan)." (J.A. at 4). However, the Government of Indonesia "officially promotes racial and ethnic tolerance" *Id*. The official Kalimantan government regulations require the two tribes to live side-by-side in peace.

The immigration judge issued an oral decision denying Darwis' applications and finding him removable. Darwis appealed the immigration judge's decision, and on September 8, 2008, the BIA dismissed the appeal. The BIA corrected a procedural defect in its decision and affirmed the decision on January 13, 2009. Darwis filed a petition for review of the BIA's decision with this Court on February 5, 2009. This court has jurisdiction pursuant to 8 U.S.C. § 1252(a)(1).

## DISCUSSION

### I. Standard of Review

Since the BIA did not summarily affirm or adopt the immigration judge's reasoning and provided an explanation for its decision, we review the BIA's decision as the final agency determination. *Ilic-Lee v. Mukasey*, 507 F.3d 1044, 1047 (6th Cir. 2007). In reviewing the BIA

3

decision, issues of pure law are reviewed de novo. *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006). Factual findings, however, must be affirmed if substantial evidence supports those determinations. *Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007). Under this standard, "we will not reverse those findings 'unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Singh v. Gonzales*, 451 F.3d 400, 403 (6th Cir. 2006) (quoting 8 U.S.C. § 1252(b)(4)(B)).

Before the immigration judge and the BIA, Darwis pursued an application for asylum, withholding of removal and Convention Against Torture protection. On appeal, Darwis does not contest the BIA's dismissal of his applications for asylum or protection under the Convention Against Torture.

## II.     Analysis

Darwis' burden is to show that it is more likely than not that if he were removed to Indonesia, his life or freedom would be threatened because he is ethnic Madurese. 8 U.S.C. § 1231(b)(3); *see I.N.S. v. Stevic*, 467 U.S. 407, 429-30 (1984). Darwis can meet his burden in two different ways. First, he can show past persecution on a protected ground, which creates a rebuttable presumption that his life or freedom would be threatened if he returned to his native country. Alternatively, he can demonstrate a future threat to his life or freedom on account of a protected ground. On appeal, Darwis attacks three findings of the BIA, namely that Darwis did not suffer past persecution, that Darwis did not establish a pattern and practice of persecution of ethnic Madurese in Indonesia, and that Darwis did not supply sufficient corroboration.[2]

---

[2]Since we find that Darwis' claim for withholding of removal fails without considering any lack of corroboration, we need not determine whether the immigration judge was correct in requiring corroboration.

4

A past threat to life or freedom requires the applicant to have suffered past persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 1208.16(b)(1)(i). If the applicant successfully demonstrates a past threat to life or freedom, it creates a presumption that his life or freedom will be threatened in the future. In this case, the BIA found that Darwis had failed to show that he was persecuted or that any attacks on him were on account of a protected ground.

Persecution is "an extreme concept that does not include every sort of treatment our society regards as offensive." *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004) (quoting *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995)). To show persecution, "[i]t is not sufficient that the applicant has been subjected to indiscriminate abuse . . . Instead, the applicant must establish that he or she was specifically targeted by the government for abuse based on one of the statutorily protected grounds." *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005); *see also Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004) (citing with approval a BIA opinion that defined persecution as "the infliction of harm or suffering by the government, or persons a government is unwilling or unable to control, to overcome a characteristic of the victim").

We believe that the rampant violence in the region around 2001 may be sufficient to show that the actions were taken by a group the government was unable to control. Unlike in *Ali*, where this Court specifically noted that a State Department report revealed no information of persecution of members of the petitioner's political party, Darwis has come forward with various documents highlighting violence between the Dayak and Madurese communities. An "Armed Conflicts Report" by Project Ploughshares found that in 2001 "brutal violence erupted between the Dayak and Madurese ethnic groups on the large Indonesian island of Borneo," noted "reports of atrocities, with

5

government security forces unable to stop the fighting," and determined that at least 1,000 people died. (J.A. at 118-120). *See also* International Crisis Group Report, "Communal Violence in Indonesia: Lesson From Kalimantan." (J.A. at 126-62).

Darwis' problem with his claim for persecution is that very little evidence suggests that the Dayak were intentionally targeting him. His application states that he "was chased by Dayak assailants many times in Kalimantan and was forced to run in fear." (J.A. at 188). He testified that he believed that the Dayak did not like him because he was prominent through his job as a supervisor. The BIA felt that Darwis was not persecuted because he referenced only two incidents, and in both instances, he escaped unscathed. "We do not find that the respondent established that any harm he himself may have suffered, even in the aggregate, was of such severity as to rise to the level of persecution." (J.A. at 4). This conclusion of the BIA is amply supported in the record.

Furthermore, even if Darwis was persecuted in the past, this finding only raises a rebuttable presumption that his life or freedom would be threatened. *Thap v. Mukasey*, 544 F.3d 674, 681 (6th Cir. 2008); 8 C.F.R. § 208.16(b)(1). That presumption is rebutted by a finding that the applicant "could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal." 8 C.F.R. § 208.16(b)(1)(i)(B). In this case, the presumption is easily rebutted by Darwis' four years free from ethnic violence in two other cities in the country. While he may have been forced to flee Sambas, he remained in the country for four years in relative peace and safety. In *Almuhtaseb v. Gonzales*, 453 F.3d 743, 750 (6th Cir. 2006), this Court found that the fact a petitioner who had been directly targeted in the West Bank stayed there for six more years "indicates that her situation in the West Bank was not sufficiently grave to constitute persecution."

6

The only evidence that Darwis would be in danger of an attack by the Dayak in a different region of Indonesia is his own testimony. He testified that he "thinks" there are problems between the Dayaks and the Madura outside of the Kalimantan region and that he felt in danger when living in Surabaya and Jakarta. He was never attacked in those other cities, never witnessed an ethnically motivated attack on a member of the Madura tribe in either city, and submitted no outside substantiation that this is a nation-wide problem. Darwis' actual experience outside the Kalimantan region rebuts any presumption created by a showing of past persecution.

For the same reason, Darwis' claim of a pattern or practice of persecution of Madurese people must also fail. In order to show a future threat to his life or freedom on account of a protected ground, Darwis need not prove that he would be singled out for violence upon returning. It is sufficient if he "establishes that in that country there is a pattern or practice of persecution of a group of persons similarly situated to the applicant." 8 C.F.R. § 1208.16(b)(2). The BIA's findings on this front are amply supported by the record due to the present tense of the requirement. While Darwis submitted substantial evidence about trouble between the Dayaks and Madurese, this information all shows that tensions heightened around 2001, when not coincidentally the events Darwis personally witnessed occurred. While tensions remain high, wide-scale violence is no longer a problem.[3] In part, the declining violence is because the Madurese were effectively forced from

---

[3]The 2005 State Department Country Report on Human Rights Practices noted: "In Central Kalimantan, relations between indigenous Dayaks and ethnic Madurese transmigrants remained poor in the wake of 2001 interethnic violence. However, at least 30 thousand to 57 thousand displaced ethnic Madurese had returned to Central Kalimantan by year's end. Despite interethnic tensions, local elections were orderly and relatively peaceful. Relations between the two groups also remained poor in West Kalimantan, where former residents of Madurese descent were obstructed in their attempts to reclaim their property." (J.A. at 103).

7

Sambas and the surrounding area. While Darwis likely could not return to Sambas, the record amply supports a determination that he can safely return to Indonesia.

Darwis' only evidence to combat the reasonable finding of the BIA is his own testimony that he still believed he was in danger after leaving Sambas. While the immigration judge did find Darwis credible, his mere assertion of fear is not sufficient to meet his burden "that it is more likely than not that he . . . will be persecuted upon return" to Indonesia. *Kaba v. Mukasey*, 546 F.3d 741, 751 (6th Cir. 2008) (quotations and citations omitted). This standard is more stringent than the standard for asylum, which provides that a petitioner need only show a "well-founded fear." Even under the lower standard for asylum, Darwis would need to provide objective support for his own testimony that he felt fear of Dayak attacks elsewhere in Indonesia. *See Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004) ("A well-founded fear of persecution thus has both a subjective and an objective component: an alien must actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an 'objective situation' under which his fear can be deemed reasonable."). Neither Darwis nor his outside sources show problems between the Madura and Dayak that today rise to the level of persecution. While Darwis testified that the Dayak and Madura tribes have problems outside of West Kalimantan, only in that region has there been the large-scale attacks that may amount to persecution because the government arguably is unable to control the violence. The confined location of the tension, as well as the apparent thawing of the conflict, means that Darwis cannot show a pattern or practice of persecution of Madurese throughout Indonesia.

**CONCLUSION**

For the reasons set forth above, we **DENY** Darwis' petition for review.

8