NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0526n.06

No. 09-3844

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Aug 18, 2010**

LEONARD GREEN, Clerk

| | |
|---|---|
| EMANOEL BIRIIAC, | ) |
| | ) |
| Petitioner, | ) |
| | ) ON PETITION FOR REVIEW FROM |
| v. | ) ORDER OF THE BOARD OF |
| | ) IMMIGRATION APPEALS |
| ERIC H. HOLDER, JR., | ) |
| | ) |
| Respondent | ) |
| | ) |
| | ) |

**Before: COLE and McKEAGUE, Circuit Judges; and MAYS, District Judge.**\*

**SAMUEL H. MAYS, JR., District Judge**. Petitioner Emanoel Biriiac seeks review of the

Board of Immigration Appeals' (the "Board") Order adopting and affirming the Immigration Judge's

denial of Biriiac's request for asylum, withholding of removal, and relief under the Convention

Against Torture (the "CAT"). Petitioner challenges the IJ's findings that he was not credible; did

not suffer past persecution; did not possess a well-founded fear of future persecution; was not

eligible for withholding of removal; and was not eligible for relief under the CAT. For the following

reasons, we **DENY** Biriiac's petition.

---

\*The Honorable Samuel H. Mays, Jr., United States District Judge for the Western District of Tennessee, sitting
by designation.

## BACKGROUND

Emanoel Biriiac is a native and citizen of Romania. He last entered the United States without inspection in 1994 as a stowaway on a cargo vessel. On August 19, 1994, Biriiac filed an Application for Asylum with the Immigration and Naturalization Service. He appeared for an interview on that application on September 6, 1995. The application was then referred to the Immigration Court on September 11, 1995, and an Order to Show Cause was issued. Biriiac was later placed in removal proceedings with the issuance of a Notice to Appear ("NTA") on July 27, 2005, charging Biriiac with being present in the United States without having been admitted.

At a Master Calendar Hearing on May 17, 2006, Biriiac admitted the allegations contained in the NTA and conceded removability. On or about February 7, 2007, Biriiac renewed his Application for Asylum and filed an Application for Withholding of Removal and for relief under the CAT. An individual hearing on the merits was held on June 4, 2008.

In support of his application, Biriiac testified that he was born in Todiresti, Romania, and lived there for eighteen years. He first left Romania in February 1993 and went to Germany where he applied for, but was denied, asylum. He unsuccessfully attempted to enter Germany on two other occasions. In November 1993, Biriiac entered France and applied for asylum. In May 1994, before receiving a decision on that application, he stowed away on a cargo ship and illegally entered the United States without inspection. Biriiac admitted that it had always been his goal to get to the United States. He filed an Application for Asylum on August 19, 1994.

Biriiac testified that he practices the Pentecostal religion and regularly practices his religion in the United States, where he attends the Romanian Pentecostal Church in Dearborn Heights, Michigan. He testified that his entire family is active in the Pentecostal Church, and that his parents

2

and three youngest siblings live in Todiresti and regularly attend Pentecostal services. The Pentecostal Church is one of 18 recognized churches in Romania, but Biriiac testified that he had suffered because of his Pentecostal beliefs. He was harassed and insulted in school by other students and by teachers because of his religion. He also had physical altercations with fellow students after school, but was usually able to escape, sustained no or minimal injuries, and never required medical treatment because of those altercations. Pentecostal prayer meetings are held in the private homes of church members. Biriiac testified that neighbors and priests of the Romanian Orthodox Church disrupt the mid-week meetings, claiming that the meetings are too loud.

Biriiac's grandmother converted from Orthodoxy to Pentecostalism when she married his grandfather. His grandmother's family from her first marriage remained Orthodox. When his grandmother was eighty-three years old, her daughter from her previous marriage took her to an Orthodox monastery where she was re-baptized in the Orthodox religion. His grandmother's son from her previous marriage was an Orthodox priest who lived at or near the monastery. Biriiac's grandmother died two weeks after she was re-baptized and was buried during the night in an Orthodox cemetery without the knowledge or consent of his grandfather.

Biriiac's grandfather was the first Presbyter in their area of Romania. A Presbyter approves the members in the church and confirms that they are "good Pentecostal Christian[s]." Biriiac's grandfather served in that position until he married his second wife, when he was no longer eligible because those who marry more than once cannot serve in positions of authority in the Pentecostal Church.

Pastor Iaon Buia of the Romanian Pentecostal Church of God in Dearborn Heights, Michigan, where Biriiac worships, testified in support of Biriiac's application. Buia testified that

3

he founded the Evangelists for Eastern Europe, which preaches the gospel and spreads the Pentecostal faith in five eastern European countries, including Romania. He testified that the organization has approximately seventy-five evangelical ministers working in Romania. Buia testified that he last traveled to Romania in late July and August 2007 for an annual conference with his organization's evangelical ministers. According to Buia, it is difficult to find a venue for Pentecostal revivals in Romania, particularly in rural areas, so he often is forced to hold those events outside. Buia testified that there is a "mob mentality" in Romania and that members of the Orthodox religion hit Pentecostal worshipers, slash their car tires, and break their car windows while yelling and screaming insults. Buia also testified, however, that members of the Pentecostal community have "no problem" assembling for worship services on Sunday if they "have a building, and [they] have a name on the building, and [they are] in the city – even in the villages." Buia testified that in metropolitan areas it is not "that hard" for Pentecostals.

After the hearing, the IJ rendered her opinion, denying Biriiac's applications and ordering him removed to Romania. The IJ found that Biriiac's testimony was not credible based on inconsistencies between his asylum application and his testimony about the conversion of his grandmother and the persecution of his grandfather. The IJ also found that Biriiac had failed to demonstrate past persecution or a well-founded fear of future persecution. Specifically, she found that the alleged incidents involving Biriiac's grandmother constituted a familial dispute; that the harassment Biriiac experienced from teachers, fellow students and neighbors did not rise to the level of persecution; and that his claim of a well-founded fear of future persecution was undercut because: (1) the Pentecostal Church is recognized in Romania; (2) Biriiac's parents and three siblings attend Pentecostal services in their Romanian village; and (3) members of the Pentecostal Church in

4

metropolitan areas of Romania are not subject to the same harassment as those in rural areas. Finally, the IJ denied Biriiac's application for protection under the CAT because he submitted no evidence of past torture, there was "little or no evidence" of torture by the Romanian government, and discrimination by members of the Romanian Orthodox Church did not constitute torture.

On June 29, 2009, the Board adopted and affirmed the IJ's decision and dismissed Biriiac's appeal. The Board found that the IJ's credibility findings were not clearly erroneous based solely on discrepancies concerning the harm his grandmother allegedly suffered. The Board also found that Biriiac's testimony about his grandmother and his harassment by students, teachers, and Orthodox neighbors did not show past persecution or a well-founded fear of future persecution. Finally, the Board found that the evidence was inadequate to show that it was more likely than not that Biriiac would face torture if he returns to Romania.

## STANDARD OF REVIEW

Where the Board adopts the IJ's decision and provides additional commentary, the Court reviews the IJ's decision, as supplemented by the Board, as the final order. *Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007); *Gilaj v. Gonzales*, 408 F.3d 275, 282-83 (6th Cir. 2005). This Court reviews factual findings, including adverse credibility determinations, using the "substantial evidence" standard. *Mapouya v. Gonzales*, 487 F.3d 396, 405 (6th Cir. 2007). Because all four issues raised by Petitioner challenge factual findings, the "substantial evidence" standard applies to each.[1] Under that standard, factual findings "must be upheld if supported by reasonable, substantial,

---

[1] Petitioner's Standard of Review section notes that the "substantial evidence" standard applies to credibility determinations, his asylum claim, his withholding of removal claims, and his CAT claim. (*See* Petitioner's Memo at 13-14.) However, throughout his memorandum, Petitioner refers to an abuse of discretion standard and to a clear error standard. (*See id.* at 15, 18, 20, 25, and 16.) Neither standard applies here. As the Petitioner correctly states in his standard of review section, the substantial evidence standard applies to all four issues.

and probative evidence on the record considered as a whole." *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998) (citation and internal quotation marks omitted). This is a "deferential standard which 'plainly does not entitle a reviewing court to reverse . . . simply because it is convinced that it would have decided the case differently.'" *Klawitter v. INS*, 970 F.2d 149, 151-52 (6th Cir. 1992) (citations omitted; omissions in original). To hold contrary to the IJ's factual findings, "the reviewing court must find that the evidence not only supports a contrary conclusion, but indeed compels it." *Id.* at 152 (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)) (emphasis in original); *See* 8 U.S.C. § 1252(b)(4)(B) ("[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary").

## ANALYSIS

### I. Credibility Finding

Biriiac argues that the IJ erroneously[2] determined that he lacked credibility and failed to provide sufficient corroborating evidence. (Petitioner's Brief on Appeal at 16.) ("Pet.'s Brief") He asserts that the IJ based her credibility finding predominantly on slight discrepancies between his application and his testimony about his grandmother's death, and that "in general," he testified consistently with the information contained in his written application. (*Id.* at 16.)

The IJ and the Board determined that the REAL ID Act of 2005, 8 U.S.C. § 1158(b)(1)(B)(iii), credibility standards applied to Biriiac's asylum application, which he initially filed with an asylum officer on August 19, 1994. *See Kaba v. Mukasey*, 546 F.3d 741, 749 n.1 (6th Cir. 2008) (noting that the REAL ID Act applies only to applications for asylum filed after May 11,

---

[2]As discussed above, despite Petitioner's assertion that the IJ "clearly erred," (*see* Pet.'s Brief at 15.), the Court applies the substantial evidence standard, as opposed to a clearly erroneous standard, to the IJ's credibility findings.

2005); *see also Camara v. Holder*, 349 F. App'x 86, 89 (6th Cir. 2009) (where initial application is filed before May 11, 2005, Real ID Act does not apply). The REAL ID Act allows credibility determinations to be based on a variety of factors, including demeanor, candor, and inherent plausibility, *see* 8 U.S.C. § 1158(b)(1)(B)(iii), whereas the prior standard required that credibility determinations "be based on issues that go to the heart of the applicant's claim." *Pergega v. Gonzales*, 417 F.3d 623, 627 (6th Cir. 2005). Biriiac did not challenge the credibility standard applied by the IJ when Biriiac appealed to the Board. Therefore, this Court lacks jurisdiction to consider the issue. *See* 8 U.S.C. § 1252(d)(1); *see also Sterkaj v. Gonzales*, 439 F.3d 273, 279 (6th Cir. 2006) ("Only claims properly presented to the BIA and considered on their merits can be reviewed by this court in an immigration appeal." (quoting *Ramani v. Ashcroft*, 378 F.3d 554, 559 (6th Cir. 2004)). Although the IJ asserted that the REAL ID Act credibility standards applied to Biriiac's application, her analysis of his credibility was essentially a "heart of the claim" analysis. She noted that the primary event to which Biriiac testified as evidence of persecution, the alleged abduction of his grandmother, was the main source of inconsistency. In affirming the IJ's finding, the Board specifically concluded that the inconsistencies and omissions in Biriaac's testimony concerned a "central aspect of his past persecution claim."

The IJ's finding that Biriiac was not credible was based primarily on Biriiac's account of the harm his grandmother allegedly suffered. In his asylum application, Biriiac stated that his grandmother "was abducted by an Orthodox priest." At the hearing, he testified that his grandmother was actually taken by her daughter to a Romanian Orthodox monastery and re-baptized in the Orthodox Church. After further cross-examination, Biriiac testified that the priest in question was his grandmother's son. Biriiac asserts that any inconsistency is explained because the Orthodox

7

priest was in fact the grandmother's son. This fact, revealed only after thorough cross-examination, does not resolve the inconsistency. Although the application stated that his grandmother was abducted by an Orthodox priest, in his testimony Biriiac explained that what had actually occurred was that his grandmother had been taken by her daughter to a monastery where or near where her son was a priest and re-baptized in the Orthodox church. This discrepancy could reasonably be viewed as an attempt to "enhance his claims of persecution" and found to go to the heart of the matter at issue in Biriiac's hearing. *Pergega*, 417 F.3d at 627. Substantial evidence supports the IJ's finding that Biriiac's explanation of his grandmother's abduction was "disingenuous and less than straightforward." In affirming the adverse credibility finding, the Board focused exclusively on the inconsistencies and omissions about the "harm allegedly suffered by his grandmother," and concluded that this inconsistency alone was sufficient to find Biriiac not credible.

Biriiac also challenges the IJ's finding of inconsistencies in his account of the burial of his grandmother. In her Order, the IJ discusses the burial of Biriiac's grandmother in an Orthodox cemetery and notes inconsistencies between the application and his testimony. The IJ's Order states that the application said the grandmother was buried "over the objections" of his family, but Biriiac testified that she was buried without the family's knowledge. Biriiac asserts that his application stated, "we were not allowed to bury her in our cemetery," a statement consistent with his testimony on this issue. (Pet.'s Brief at 17.) The statements that "the family did not know about the burial until after the fact" and "we were not allowed to bury her in our cemetery" are not the same. The latter implies that the family attempted to bury her and was denied that right, or, as the IJ stated, that she was buried "over the objections" of the family. Although this is a minor inconsistency, substantial

8

evidence supports the IJ's finding of a discrepancy between the application and Biriiac's testimony on this issue.

Biriiac finally asserts that the IJ's determination was improper because he provided documentary evidence supporting his claims about his grandmother's death. The IJ stated that she could give little or no weight to the document Biriiac presented because the knowledge of the individuals who provided the document is not set forth in Biriiac's application; the individuals are describing events that occurred 14 years before the document was created; and the document provides no evidence about whether those individuals were privy to events or how they obtained the information. Even so, the document provides no support for Biriiac's argument that he was improperly found not credible. The document does not support the statement that his grandmother was abducted by an Orthodox priest or that there was a forced conversion. Although the IJ properly assigned little or no weight to this document, its consideration does not support a finding that Biriiac was credible.

Although Biriiac does not raise the issue on appeal, the IJ also found that there was reason to question Biriiac's credibility based on his failure to testify about the alleged persecution of his grandfather. Biriiac's application stated that his grandfather was a target of persecution, but Biriiac did not testify to any such persecution. Biriiac has failed to address this omission in his appeal to the Board or to this Court. *See* 8 U.S.C. § 1252(d)(1). Biriiac's failure to testify about the alleged persecution of his grandfather gives substantial support to the adverse credibility finding. In addition to his allegations about the abduction and forced conversion of his grandmother and his harassment at school, Biriiac's past persecution claim was based on the alleged persecution of his grandfather.

9

Biriiac's failure to testify about <u>any</u> harm befalling his grandfather reasonably caused the IJ to question his credibility.

The IJ provides specific reasons for finding Biriiac not credible. *See Pergega*, 417 F.3d at 628 (Although the Court must afford "substantial deference" to an IJ's adverse credibility determination, the determination "must be supported by specific reasons.") Her decision is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Mikhailevitch*, 146 F.3d at 388. Therefore, we affirm the IJ's determination that Biriiac was not credible.

## II. Eligibility for asylum

An alien who seeks asylum must establish that he is a "refugee." *See* 8 C.F.R. § 1208.13(a); *see also Koliada v. INS*, 259 F.3d 482, 486-87 (6th Cir. 2001). The Immigration and Nationality Act defines a refugee as a person unable or unwilling to return to his or her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004) (citation omitted). Actions that may rise above mere harassment to the level of persecution include "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture." *Gilaj*, 408 F.3d at 285 (citation omitted).

To establish past persecution, an alien must show harm rising to the level of persecution, based on a statutorily enumerated ground, that is committed by the government or by forces the

10

government is unable or unwilling to control. 8 C.F.R. 1208.13(b)(1); *Khalili v. Holder*, 557 F.3d 429, 436 (6th Cir. 2009). Where the applicant establishes past persecution, there is a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1).

Absent a finding of past persecution, to establish a "well-founded fear" of future persecution, an alien must show that his fear is genuine and "he must present evidence establishing an 'objective situation' under which his fear can be deemed reasonable." *Perkovic v. INS*, 33 F.3d 615, 620-21 (6th Cir. 1994) (citation omitted). An applicant does not have a well-founded fear of persecution if he could relocate to another part of his country of nationality to avoid persecution if, under all of the circumstances, it would be reasonable to expect him to do so. 8 C.F.R. § 1208.13(b)(2)(C)(ii).

In establishing eligibility for asylum, an alien's own testimony may be sufficient when it is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis for the fear. *See Matter of Mogharrabi*, 19 I. & N. Dec. 439, 445 (BIA 1987). The weaker the applicant's testimony, the greater the need for corroboration. *Pilica*, 388 F.3d at 954.

## A. Past Persecution

Biriiac asserts that the IJ and the Board failed to evaluate the events as a whole, and, although the events individually might not constitute persecution, taken together they demonstrate that Biriiac and his family suffered past persecution. (Pet.'s Brief at 20.) He also asserts that the IJ's statement that "a family dispute and harassment from other students unaccompanied by physical violence do not rise to the level of persecution" is a "gross misinterpretation" of the events to which Biriiac testified. (*Id.* at 19.) To support these arguments, Biriiac merely recounts the events to which he testified and that the IJ weighed in making her determination that he presented no evidence of behavior rising to the level of persecution. (*See id.* at 19-20.) Specifically, he notes he testified that

11

he was harassed and threatened at school by students and teachers because of his religion; that he would run away from other students to avoid involvement in physical altercations; that Pentecostal prayer meetings were interrupted by neighbors; and about the circumstances surrounding his grandmother's "kidnaping," forced conversion, and burial. (*Id.* at 19-20.)

As to the harassment and insults from other students and teachers, Biriiac testified that he was insulted and harassed by fellow students and teachers and that he got into some fights with other students at school. He also testified, however, that he suffered no injury or only minimal injuries from these fights and never needed medical treatment as a result of a fight. This evidence does not compel a finding of past persecution. *See Gilaj*, 408 F.3d at 285.

Biriiac also has offered no evidence compelling the conclusion that the incidents involving his grandmother constituted persecution as opposed to "interfamilial problems" or a "family dispute." Biriiac testified that his grandmother was taken by her daughter to a monastery, where she was re-baptized in the Orthodox religion, and that she later died and was buried in an Orthodox cemetery without the knowledge of her family. Biriiac presented no evidence that the Romanian government, or anyone outside of the family, was involved in his grandmother's abduction or conversion or that the government was unable or unwilling to control his grandmother's daughter. *See Khalili*, 557 F.3d at 436.

As to the interruptions of the prayer meetings, Biriiac testified that, when prayer meetings are held during the week in homes, neighbors and members of the Orthodox Church disrupt the meetings because they think that they are too loud. Such evidence does not compel a finding of persecution.

In concluding that Biriiac had failed to demonstrate past persecution, the Board specifically considered his "testimony and evidence regarding his grandmother's alleged forced conversion to the Orthodox faith and being harassed by students, teachers, and neighbors of the Orthodox religious faith." The IJ also cited in her Order all of the incidents that Biriiac cites to this court. Taking these incidents individually or as a whole, the record evidence does not compel the conclusion that Biriiac suffered harm rising to the level of persecution. Substantial evidence supports the finding that Biriiac did not suffer past persecution.

## B. Well-founded Fear of Future Persecution

Biriiac also challenges the IJ's finding that he did not possess a well-founded fear of future persecution and that, even if he did, he could relocate within Romania to avoid any potential persecution. (Pet.'s Brief at 22.) First, Biriiac argues that he established past persecution and, thus, is entitled to the presumption of a well-founded fear of future persecution. (*Id.*) As discussed above, substantial evidence supports the finding that Biriiac failed to show past persecution. Therefore, he is not entitled to the presumption of a well-founded fear of persecution. The burden remains with Biriiac to show that he has a well-founded fear of persecution on the basis of one of the five protected categories if he returns to Romania. 8 C.F.R. § 1208.16(b)(2); *see also* 8 U.S.C. § 1101(a)(42)(A). He also bears the burden of establishing that it would not be unreasonable for him to relocate. *Id.* § 1208.13(b)(3)(I). To demonstrate a well-founded fear, the fear of future harm must not only exist for the applicant subjectively, but must also be objectively reasonable. *Allabani v. Gonzales*, 402 F.3d 668, 674 (6th Cir. 2005).

Biriiac asserts that he established a well-founded fear of future persecution by testifying to the difficulties his family members continue to face in practicing their religion in Romania; through

13

the testimony of Buia about the difficulties Pentecostals endured throughout Romania; and based on documentary evidence, specifically the Department of State's International Religious Freedom Reports on Romania and other articles discussing the mistreatment of minority groups, including Pentecostals. (Pet.'s Brief at 24.) Biriiac's contention that these factors "clearly establish" a well-founded fear of future persecution is not supported by the testimony of Biriiac or Buia. Biriiac testified that his family attends religious services in their village on a regular basis and has never been physically harmed. His family members merely argue with Orthodox neighbors. Buia testified that Pentecostals in cities and villages have no problem assembling for Sunday Services if they have a building. Buia also stated that the situation for Pentecostals was better in the metropolitan areas of Romania.

The documentary evidence to which Biriiac refers does not compel a finding of a well-founded fear of future persecution. He cites more than 100 pages of the record, but does not specifically refer to any evidence in those 100 pages. (*Id.* at 24.) Within the pages cited are articles discussing country conditions and the Pentecostal Church's position as one of the eighteen recognized religions in Romania. There are assertions that Romanian Orthodox Church authorities often are intolerant of other religious groups and criticize those groups' "aggressive proselytizing," leading to "conflicts in some cases." Evidence of discriminatory treatment of minority religions does not compel the conclusion that Biriiac has a well-founded fear of future persecution on account of his religion. The IJ considered Biriiac's documentary evidence of harassment by the Orthodox majority and stated "[i]t is well-settled that, while discrimination is an unfortunate byproduct in many societies, it does not establish persecution in and of itself unless it rises to that level." Biriiac cites nothing in the documentary evidence that compels a finding of future persecution.

14

Biriiac did not meet his burden of showing past persecution or a well-founded fear of future persecution. Substantial evidence supports the IJ's conclusion that Biriiac failed to establish eligibility for asylum.

## III. Withholding of Removal

Biriiac argues that he has met his burden of proof for withholding of removal because he has established his eligibility for asylum based on past persecution and a well-founded fear of future persecution. (*Id.* at 26.) For the reasons discussed above, we reject that argument and conclude that substantial evidence supported the IJ's finding that Biriiac did not demonstrate that he suffered past persecution or possesses a well-founded fear of future persecution.

To establish entitlement to withholding of removal, the applicant has the burden of proving a "clear probability" that upon removal he would face future persecution based on protected statutory grounds. *Castellano-Chacon v. INS*, 341 F.3d 533, 545 (6th Cir. 2003). The "clear probability" standard is more difficult to satisfy than the "well-founded fear of persecution" standard in asylum cases. *Kaba*, 546 F.3d at 751. Thus, an applicant who fails to establish a well-founded fear of persecution for asylum purposes necessarily cannot meet the more onerous burden for withholding of removal. *Id.* Because the evidence in this case does not compel a finding of past persecution or a well-founded fear of future persecution, it necessarily forecloses eligibiity for withholding of removal.

## IV. Convention Against Torture

Biriiac asserts he has established that it is more likely than not that he would be tortured if removed to Romania. (Pet.'s Brief at 27.) In support, he argues he has demonstrated that the government does not interfere with, attempt to prevent, or punish the actions of Orthodox

15

community members, who at times gather as mobs to attack Pentecostals practicing their religion, and he cites the Department of State's reports in the record as confirmation that the Romanian government is unwilling or unable to prevent members of the Orthodox community from harming members of the Pentecostal faith. (*Id.* at 27.)

To qualify for protection under the CAT, an applicant has the burden of showing it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(1) & (2). In assessing whether that standard has been met, "all evidence relevant to the possibility of torture shall be considered," including evidence of past torture of the applicant, "[e]vidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured," and "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal." *Id.* § 16(c)(3).

Biriiac claims it is more likely than not that he will be attacked by mobs of Orthodox community members in Romania. (Pet.'s Brief at 27.) However, he fails to demonstrate that any such attack is more likely than not, or that it would constitute torture. *See* 8 C.F.R. § 1208.18(a)(2) ("Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading punishment that do not amount to torture."); *see also Bassam v. Holder*, No. 08-3924, 2009 WL 2170106, at *6 (6th Cir. July 21, 2009) (torture "involves more severe treatment than persecution"). Biriiac testified that he had altercations with other classmates as a student. That is the only physical violence or assault he or his family experienced. Buia testified that there is a mob mentality in some rural areas of Romania, but stated that it does not affect Pentecostals who have a building and is not a problem in metropolitan areas. Biriiac has not offered evidence of any behavior rising to the level of torture.

16

Biriiac again cites more than 100 pages of the record discussing country conditions, the same section of the record cited to support his asylum claim. (Pet.'s Brief at 27.) As discussed above and by the IJ, this information includes evidence of discrimination against Pentecostals by members of the Romanian Orthodox Church, but does not describe any behavior rising to the level of torture. Biriiac fails to demonstrate that evidence in the record would compel any reasonable adjudicator to conclude that it is more likely than not he would be tortured if returned to Romania. Substantial evidence supports the IJ's and the Board's conclusion that Biriiac failed to meet his burden under the CAT.

## CONCLUSION

For the foregoing reasons, Biriiac's petition for review is DENIED.