NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0333n.06

Case No. 08-3860

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

JUNE 1, 2010
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| WARIO ZACHARIAH ABARUFA HUSSEIN, A95-599-461 | ) ) ) | |
| Petitioner, | ) ) ) | ON APPEAL FROM THE BOARD OF IMMIGRATION APPEALS |
| v. | ) ) | |
| ERIC H. HOLDER, JR., Attorney General | ) ) | |
| Respondent. | ) ) ) ) ) | |

BEFORE: BATCHELDER, Chief Judge, COLE, Circuit Judge; and Lawson[*], District Judge.

**David M. Lawson, District Judge.** Petitioner Wario Zachariah Abarufa Hussein, a Kenyan national, petitions the Court for review of the decision of the Board of Immigration Appeals (BIA) denying his application for asylum, withholding of removal, and request for relief under the convention against torture. The petitioner tells a story of his conversion from Islam to Christianity and his family's violent objections to his change of faith. He says he cannot return to his community in Kenya without fear of being killed. The Immigration Judge (IJ) denied relief because, although he found that the petitioner was credible, he determined that the petitioner's experience in Kenya as a Christian did not rise to the level of persecution, and the petitioner did not establish a well-founded fear of future persecution. The BIA agreed with the IJ's findings in a written opinion. Hussein

---

[*]The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

petitions for review of that decision. Because we find that the decision of the IJ as supplemented by the BIA's decision is supported by substantial evidence, we deny the petition.

## I. Facts and Proceedings

### A. Facts

The petitioner was born on February 22, 1975 to a family in the Oromo tribe in the Tana River District in Southeast Kenya. His family – and virtually all members of the Oromo tribe – subscribed to the Islamic faith and raised him as a devout Muslim. The region in which he was born is approximately ninety percent Muslim. Kenya as a whole is a majority Christian country. According to the State Department's 2008 report on human rights practices in Kenya, there is considerable tolerance between religions, although some Muslims have complained of being treated like second-class citizens compared to Christians.

Hussein testified that when he was young, he often listened to a Swahili language radio station that broadcast Christian music. When he sang the Christian songs that he learned, his family scolded him and instructed him not to sing "bad songs." JA at 54. One time, his sister Fatuma heard him singing and slashed him with a machete, cutting his neck and leaving a scar.

In 1988, a former principal of the school that Hussein attended invited him to his house for Christmas and took Hussein to church. Hussein testified that his attitude towards Christianity at this time "was negative." JA at 57. However, in August 1989, when Hussein was in the eighth grade, he converted to Christianity.

Hussein attended a boarding school for high school. Other students from his hometown learned that he was Christian when he attended church at the school. He testified that he was

subjected to beatings that grew more severe when he complained to the school administration. He began to receive letters from his family and Muslim leaders directing him not to come home as a Christian. However, during the next school break, which fell during Ramadan in April 1990, he went home to his mother's house. When he told his family that he was not fasting because he was Christian, they became upset. His mother told him to leave home before "the worst thing happens" to him. JA at 67. He believed that his life was in jeopardy, so he left and stayed with his former principal.

A few days later, he was summoned to appear before a chief, a local government official, to explain why he left home without his parents' consent. In the hierarchy of the Kenyan government, the chief reports to a district officer, who reports to the district commissioner. At a hearing on April 16, 1990, Hussein told the chief that he was afraid to return home due to his conversion. The chief ruled that he must return home, but that the government would be liable if anything happened to him. Hussein was "sort of satisfied" with the government's efforts to protect him. JA at 71. He received a police escort for most of the way home.

After he arrived at home, his family continued to attempt to persuade him to convert back to Islam. His sister Halima invited him over to break the fast on the evening of April 18, 1990. He was offered a drink, but he felt uncomfortable and refused. He says that he left the house and then overheard his family members discussing the drink, revealing that it was poisoned. When he confronted them, they denied it.

Following this incident, Hussein returned to his mother's home and stayed there for a week. His family then sent him to a "magician" to attempt to persuade him to reconvert. Hussein, however,

sneaked away and went to see a missionary pastor. The pastor took Hussein to see a district officer, who determined that Hussein's life might be in danger if he continued to stay with his family, and authorized him to sever ties with his family. Hussein felt safer after this action.

Hussein returned to his school and no longer went home during breaks. Instead, he stayed with different families. The beatings he experienced at his school became worse, so he was transferred to another boarding school. He graduated high school in 1994.

After his graduation, Hussein attended Christian meetings and engaged in efforts to convert people. Once, he was slapped by a Muslim while he was proselytizing. After this incident, the government provided him with police officers to protect him while he was proselytizing. However, on one occasion, he was on a motorcycle and was chased by Muslim youth in a Land Rover for a few miles. He was able to escape without injury.

In August of 1996, Hussein was admitted to the United States on a student visa. He had been given a full scholarship to Hope College in Holland, Michigan. In 1998, Hussein returned to Kenya for his niece's funeral. He had hoped to reconcile with his family, but they expressed their disappointment and demanded that he renounce Christianity. He testified that on one occasion while he was riding his bicycle, a family friend knocked him off and shoved him, then left. In his application for asylum or withholding of removal, Hussein claims that he was called Satan and that people threw garbage and old batteries at him while he was on his bicycle, although these incidents were not included in his testimony before the IJ. After three weeks, he returned to the United States.

In 2000, Hussein graduated from Hope College and registered at a community college to maintain his student status. While attending Hope, he began corresponding with a reliable individual

in Kenya and continued to do so after he graduated. In 2002, Hussein received a letter from that individual informing him that the African Muslim Agency, which was active in Kenya, stated that they would "eliminate" Hussein if he came home and resumed proselytizing. JA at 110.

Hussein testified that he is in the process of writing a book detailing his conversion to Christianity and his struggles in Kenya. He had hoped that it would be published within a few months of his application, but as of the date of his testimony before the immigration judge, he did yet not have a publisher.

In 2001, Hussein's former Hope College roommate went to Kenya. He met with that same reliable individual, but did not talk about religion. The individual invited the roommate to meet Hussein's family, but the roommate was unable to do so because bandits and warring tribes were preying on the route to the region during his visit.

**B. Agency proceedings**

On September 11, 2003, the United States commenced removal proceedings against Hussein because he was no longer a student and therefore was in violation of his visa. Hussein conceded that he was no longer in compliance with his visa status. After removal proceedings had commenced, he applied for asylum, withholding of removal, and protection under the convention against torture.

Hussein appeared for a hearing before Immigration Judge (IJ) Robert Newberry on August 16, 2006. At the conclusion of the hearing, the IJ announced his decision orally, denied Hussein's application, and ordered that he be removed to Kenya. The IJ found that Hussein's petition was timely and that Hussein's testimony was largely credible, except for the testimony about being thrown from a bicycle in 1998, since he omitted this incident from the excerpts of his book in the

record. The IJ determined, however, that the events did not rise to the level of persecution, and there was no reason Hussein could not avoid difficulty by moving to another part of predominantly Christian Kenya. The IJ further noted that Hussein was not persecuted when he returned home in 1998, and he failed to show a pattern of persecution against similarly situated Christians. Finally, the IJ rejected Hussein's claims under the convention against torture, finding that Hussein had not shown that he would be murdered upon his return to Kenya, and noting that his testimony and the country reports suggested that he could return without harm.

In a written opinion issued on June 24, 2008, the BIA "dismissed" Hussein's appeal, although it denied the government's motion for summary affirmance and addressed the merits. The BIA determined that none of the incidents alone or in combination rose to the level of persecution, except the assault by Hussein's sister, which occurred before he converted to Christianity. It explicitly stated that being scolded and having garbage and batteries thrown at him did not rise to the level of persecution, citing *Lumaj v. Gonzales*, 462 F.3d 574, 577 (6th Cir. 2006) ("[P]ersecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional.") (quoting *Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993)). The BIA also concluded that the government did not cause the incidents and took affirmative steps to protect Hussein on three occasions. The Board also found that Hussein did not prove a well-founded fear of future persecution because he did not show that he could not relocate to another part of Kenya, and he had previously returned to Kenya without incident. 8 C.F.R. § 1208.13(b)(3)(i). Because Hussein had not demonstrated a well-founded fear of persecution, the BIA determined that he also failed to meet the higher burden of proof required for withholding of removal.

## C. Proceedings in this court

On July 7, 2008, Hussein petitioned this court for review of the BIA's decision. He filed an emergency motion for stay of removal, which was denied on September 12, 2008. The court accepted the petitioner's untimely brief on November 25, 2008. The respondent timely filed his brief on January 28, 2009. Both parties waived oral argument and the court scheduled the case for submission on the briefs on April 21, 2009. However, on March 26, 2009, the petitioner filed a motion to hold in abeyance the proceedings in this court, explaining that he had filed a motion to reopen his case before the BIA on March 26, 2009 alleging changed country circumstances due to the recent publication of his book describing his life and his views on Islam. The government opposed the motion, but on April 15, 2009, we granted the petitioner's motion and stayed the matter. We also ordered "counsel for the petitioner [to] file a status report no later than May 15, 2009 and every 30 days thereafter until the motion to reopen is decided," Order Granting Mot. at 1, instructions that mostly were ignored.

After sustained inquiry by the court's staff, more missed deadlines, our order to show cause, and intervention by the petitioner's counsel's dean, petitioner's counsel finally filed a response to the show cause order on December 10, 2010. We then learned that the BIA "dismissed" the motion to reopen on October 29, 2009 because the motion was untimely and the petitioner failed to establish changed country conditions. This matter is now ready for decision.

## II. Jurisdiction and Standard of Review

This Court has jurisdiction to review the Board's decision under 8 U.S.C. § 1252. *Patel v. Gonzales*, 470 F.3d 216, 218 (6th Cir. 2006). The immigration hearing was completed in Detroit, Michigan, so an appeal from that decision lies in this court. 8 U.S.C. § 1252(b)(2).

The BIA stated that it "dismissed" the petitioner's appeal but addressed the merits of the IJ's determination. We believe that nomenclature is confusing, since the Board may only dismiss an appeal on certain procedural grounds, such as the filing of an untimely appeal, and the only substantive basis for dismissal is a finding that the appeal is frivolous. 8 C.F.R. § 1003.1(d)(2). There is no indication that the Board found the appeal to be frivolous or rested its dismissal on another enumerated ground. In the past when the Board has employed the incorrect "dismissal" language, we have treated the administrative decision as a decision on the merits. *See Shan Sheng Zhao v. Mukasey*, 553 F.3d 436, 442-43, amended by 569 F.3d 238 (6th Cir. 2009). We will do so here.

Because the BIA adopted the reasoning and affirmed the factual findings of the IJ in an opinion, this Court reviews the IJ's opinion directly, as supplemented by the BIA's decision. *Mapouya v. Gonzales*, 487 F.3d 396, 405 (6th Cir. 2007). Factual findings "must be sustained if the determination is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Kaba v. Mukasey*, 546 F.3d 741, 747 (6th Cir. 2008) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)); *see also* 8 U.S.C. § 1252(b)(4)(B) (providing that the IJ's factual findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"). The IJ's application of the legal principles to undisputed facts is reviewed *de novo*. *Mapouya*, 487 F.3d at 405-06.

## III.  Discussion

### A.  Asylum

We analyze a request for asylum by employing "'a two-step inquiry: first, whether the petitioner is a "refugee" within the meaning of the [Immigration and Nationality Act], and second, whether the petitioner merits a favorable exercise of discretion by the Attorney General.'" *Kaba*, 546 F.3d at 747 (alterations in original) (quoting *Chen v. Gonzales*, 447 F.3d 468, 472 (6th Cir. 2006)).  A refugee is a person "who is outside any country of such person's nationality . . .  and who is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42).  Persecution must be motivated by the applicant's protected status.  *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005) (per curiam); *see also* 8 U.S.C. § 1101(a)(42).  Moreover, the persecution must be inflicted "'by the government, or persons the government is unwilling or unable to control.'"  *Khalili v. Holder*, 557 F.3d 429, 436 (6th Cir. 2009) (quoting *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004)).  "The burden falls on the applicant to show that he . . . meets the definition of 'refugee,'" and he may meet this burden with his uncorroborated testimony.  *Mapouya*, 487 F.3d at 406.

Neither the statute nor the regulations provide a definition of "persecution."  *See Gilaj*, 408 F.3d at 284.  We have found that persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty."  *Kaba*, 546 F.3d at 748 (quoting *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998)).  However, physical punishment does not automatically meet the severity

threshold for persecution. *Gilaj*, 408 F.3d at 284. "'Types of actions that might cross the line from harassment to persecution include: detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture.'" *Id.* at 285 (quoting *De Leon v. INS*, 99 F. App'x 597, 598 (6th Cir. May 12, 2004)).

We also have rejected claims of persecution if the acts are not sufficiently grave to cause the person immediately to leave the country. *See Almuhtaseb v. Gonzales*, 453 F.3d 743, 750 (6th Cir. 2006) (holding, in a withholding of removal case, that a woman who was sprayed with chemicals, hit on her head by a thrown stone, beaten by a solider, and jailed overnight, established three incidents of physical harm and one incident of lost liberty, but they were not sufficiently grave to establish persecution because she waited six years to leave the country); *Mullai v. Ashcroft*, 385 F.3d 635, 638 (6th Cir. 2004) (holding that woman who was beaten and kicked on four separate occasions did not establish that harm was severe enough to qualify as persecution when she waited three months to leave the country).

Hussein argues that the incidents he endured in the past amounted to persecution, thereby requiring the government to prove that circumstances in his country have changed. *See* 8 C.F.R. § 1208.13(b)(1)(i)(A). He believes the proof is sufficient for him to prevail. It is true that an applicant who shows past persecution need not prove a well-founded fear of future persecution to qualify as a refugee. *See Gilaj*, 408 F.3d at 283; *Akhtar v. Gonzales*, 406 F.3d 399, 406 (6th Cir. 2005); *see also* 8 C.F.R. § 1208.13(b)(1) ("An applicant shall be found to be a refugee on the basis of past persecution if the applicant can establish that he or she has suffered persecution in the past in the applicant's country of nationality . . . ."). However, a refugee who has suffered persecution in the

past will not be granted asylum if he "could avoid future persecution by relocating to another part of the applicant's country of nationality . . . and under all the circumstances, it would be reasonable to expect the applicant to do so."  8 C.F.R. § 1208.13(b)(1)(i)(B).

We find that substantial evidence supports the IJ's decision as supplemented by the BIA that the incidents the petitioner described did not amount to persecution, and he failed to show that he could not relocate within Kenya.  A reading of the petitioner's brief suggests that he bases his claim of past persecution on the attack by his sister, the attempted poisoning, verbal harassment, and having garbage and batteries thrown at him.  In his testimony, he suggests other incidents that might support a finding of past persecution: his beatings while in high school; being slapped on the face; being chased by a SUV; and being knocked off his bicycle by a family friend.

Being slashed with a machete across the neck, when coupled with other physical attacks, may be sufficiently severe to constitute persecution.  However, the BIA found, and the petitioner does not dispute, that the machete incident was not motivated by the petitioner's religious beliefs.  This conclusion is supported by substantial evidence, since at the time the petitioner was a Muslim who had a "negative view" towards Christianity.  The attack was not "on account" of his religious views and is not relevant to whether he experienced past persecution.

The attempted poisoning was not mentioned by the Board, but it was discussed by the IJ. Although the incident itself was sufficiently severe, we have held that delay in taking action following an incident can negate a finding of severity. *See Almuhtaseb*, 453 F.3d at 750; *Mullai*, 385 F.3d at 638.  Here, the petitioner stayed with his family for a week following the incident and waited six years before coming to the United States.  *See Almuhtaseb*, 453 F.3d at 750 (finding no

persecution because applicant waited six years to come to the United States). Moreover, there is no indication that the government was unable to protect the petitioner following this incident. In fact, the petitioner's next meeting with a government official occurred a short time later, and the official allowed him to sever all ties with his family.

The petitioner testified that he was subjected to beatings of unknown severity while in high school. However, the attacks ceased when he was transferred to another school, which undermines the idea of persecution and a government unable to protect him.

The petitioner also testified that he was once slapped by an angry Muslim while he preached on the street. A slap certainly is not sufficient to constitute persecution, and following the incident the petitioner received a police escort, which undercuts any claim that the government was unwilling or unable to protect him.

When the petitioner returned – voluntarily – to Kenya, he testified he was subject to attacks while riding his bicycle. The IJ discredited the account of the first attack where the petitioner claimed that he was thrown from his bicycle, and the petitioner does not seek review of that ruling. Moreover, because the IJ explained that the petitioner did not mention the incident in the excerpts of the book he provided to the IJ, even though he discussed more trivial incidents, we find no basis for setting aside the IJ's credibility determination. *Koulibaly v. Mukasey*, 541 F.3d 613, 620 (6th Cir. 2008) (noting that "an adverse credibility finding is afforded substantial deference [if] the finding [is] supported by specific reasons" (internal citations and quotation marks omitted)). The other attack on the petitioner consisted of people throwing garbage and batteries at him. Certainly this

conduct should be condemned, but it is not severe enough by itself or in connection with the other incidents to constitute persecution.

The petitioner also argues that even if the events in his past do not constitute persecution, he has established a well-founded fear of future persecution because of his past experiences. The IJ and the BIA made findings that he did not have a reasonable fear of future persecution. The regulations provide three ways for an applicant to prove a well-founded fear of future prosecution. First, he may simply show each of the following:

> (A) The applicant has a fear of persecution in his or her country of nationality . . . on account of race, religion, nationality, membership in a particular social group, or political opinion;
> (B) There is a reasonable possibility of suffering such persecution if he or she were to return to that country; and
> (C) He or she is unable or unwilling to return to, or avail himself or herself of the protection of, that country because of such fear.

8 C.F.R. § 1208.13(b)(2)(i). Second, he may show that he suffered past persecution, which creates a presumption that he also has a well-founded fear of future persecution. *See* 8 C.F.R. § 1208.13(b)(1); *Kaba*, 546 F.3d at 748. If an applicant makes this showing, then the burden shifts to the government to show that there has been a "fundamental change in circumstances" so that he no longer should fear persecution, or that he could relocate within his former country. 8 C.F.R. § 1208.13(b)(1)(i)(A). Third, he may demonstrate that there "is a pattern or practice in his or her country of nationality" of persecution against people "similarly situated" to him on a protected ground. 8 C.F.R. § 1208.13(b)(2)(iii)(A). Whatever method used, an applicant does not have a well-founded fear of future persecution if he can relocate within the country, and (except in cases of past

persecution) the burden is on the applicant to show that relocation is not reasonable. 8 C.F.R. § 1208.13(b)(2)(ii).

Although the kinds of prior experience relevant to this determination are broader than that for establishing past persecution, the IJ and the BIA correctly found that the petitioner's fear of future persecution was not reasonable. They both noted that he voluntarily chose to return to Kenya and did not experience any serious harm. The petitioner does not point to any evidence refuting this conclusion, and there is substantial evidence to support it.

Moreover, this conclusion is further compelled by the finding made by both the BIA and the IJ that the petitioner could locate to another part of Kenya and avoid future persecution. This conclusion is supported by the petitioner's past experience (where there were no incidents for years after the petitioner moved away from the concentrated Muslim population) and the country reports, which state that the nation is predominantly Christian. *See Amir v. Gonzales*, 467 F.3d 921, 926 (6th Cir. 2006) (finding that a Muslim who converted to Christianity could find a place to live in a country with majority Christian areas).

The petitioner makes the additional argument that there is a pattern or practice of persecution against Christians (or, more specifically, Muslims who have converted to Christianity) in Kenya. The country reports considered by the IJ indicate that the country is religiously tolerant in principle and in practice, although occasionally *Muslims* complain of discrimination by majority *Christians*. The evidence in the record does not compel the conclusion that Christians are subject to a pattern or practice of persecution by the minority Muslims in Kenya. *Cf. Akhtar*, 406 F.3d at 405.

The IJ's and BIA's conclusions that the petitioner has not suffered past persecution or had a well-founded fear of future persecution is supported by substantial evidence. Because the petitioner's proofs on the issue of persecution were wanting, he cannot establish that he is a refugee, *see* 8 U.S.C. § 1101(a)(42), and therefore he is not entitled to asylum.

## B. Withholding of removal and the Convention Against Torture

"To establish a claim for withholding of removal under section 241(b)(3)(B) of the Act, an applicant must demonstrate a clear probability that his life or freedom would be threatened in the country directed for removal on account of his race, religion, nationality, membership in a particular social group, or political opinion." *Shan Sheng Zhao v. Holder*, 569 F.3d 238, 245 (6th Cir. 2009) (citing *INS v. Stevic*, 467 U.S. 407, 430 (1984)). The standard is more difficult to meet than for asylum; if an applicant does not qualify for asylum, he is ineligible for withholding of removal. *Zoarab v. Mukasey*, 524 F.3d 777, 782 (6th Cir. 2008).

The Convention Against Torture (CAT) provides protection to individuals facing removal who are likely to be tortured upon removal. To prevail on a claim under the CAT, the petitioner must prove that it is more likely than not that he will be tortured if removed to the designated country. 8 C.F.R. § 208.16(c)(2); *Ramaj v. Gonzales*, 466 F.3d 520, 532 (6th Cir. 2006). If a petitioner does not face a well-founded fear of persecution, he similarly fails to qualify for relief under CAT. *Ramaj*, 466 F.3d at 532.

Because the petitioner has failed to show that he is qualified for asylum, he does not meet the higher burdens of establishing withholding of removal or protection under the Convention Against Torture.

## IV.  Conclusion

For the foregoing reasons, the petition for review is **DENIED**.