**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0781n.06

**No. 12-3260**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JACKSON SEO, Sr. MIREILLE SEO, and JACKSON SEO, Jr., | ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) ) | ON PETITION FOR REVIEW OF AN ORDER OF THE BOARD OF IMMIGRATION APPEAL |
| ERIC H. HOLDER, Jr., Attorney General, | ) ) | |
| Respondent. | ) ) | |

**FILED**
Aug 23, 2013
DEBORAH S. HUNT, Clerk

Before: DAUGHTREY, ROGERS, and McKEAGUE, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. The lead petitioner in this immigration case, Jackson Seo, Sr., petitions on his own behalf and that of his wife and son for review of a Board of Immigration Appeals (BIA) order denying his application for asylum, withholding of removal, and protection under the United Nations Convention Against Torture. Seo contends that the BIA erred in affirming the immigration judge's adverse credibility determination and in finding that he failed to provide sufficient evidence to corroborate his claim. He also argues that the BIA erred in concluding that he had failed to establish a well-founded fear of future persecution, eligibility for relief from withholding, and eligibility for protection under the Convention Against Torture. For the reasons set out below, we deny the petition for review.

**FACTUAL AND PROCEDURAL BACKGROUND**

Seo is a native and citizen of Liberia. On February 3, 2007, he was admitted to the United States on a non-immigrant visa. Upon arrival in the United States, he joined his wife Mireille Seo and six-year-old son, who were admitted to the United States on non-immigrant visas on November 25, 2006. On April 26, 2007, Seo filed a timely application for asylum and withholding of removal with the Department of Homeland Security (DHS).

In the application, Seo asserted that he was seeking asylum on the basis of his race, political opinion, and membership in a particular social group. (Seo later clarified that by race he meant ethnicity, specifically his ethnic identity as a member of the Krahn tribe.) He claimed that he had suffered persecution both in Liberia and in Senegal, where he lived from 2002 until 2007, by members of the Liberian ex-president Charles Taylor's "death squad," working in collaboration with supporters of the Liberian Consul General in Senegal. These groups targeted Seo, he claimed, because of his family's association with another Liberian ex-president, and Taylor's political rival, Samuel Doe. They also targeted Seo because of his political prominence among the Liberian expatriate community in Senegal, which led the Consul General (who was appointed by Taylor) to view Seo as a threat to his political power.

Seo claimed that these groups threatened him and on two occasions physically attacked him. The first attack took place during a July 2006 trip Seo made to Liberia to talk to prominent Liberians about his desire to replace the Consul General in Senegal. The day after Seo met with a family friend

and the former Assistant Commanding General of Liberia, Wolo Magba, and informed him of his desire to become the Liberian Consul General in Senegal, three men who claimed to be Liberian police officers arrived at Seo's residence and requested he come with them. They then drove him to a remote area outside of Monrovia and beat and pistol whipped him. Seo said that he escaped only after other people approached the area, causing the three assailants to drive away. At that point, Seo claimed, he managed to make contact with a cousin who arranged for him to get medical treatment from a friend. In his asylum application, Seo stated that he and his cousin also went to the police station after the attack to report the incident. (In subsequent testimony, Seo testified that his cousin went alone to report the incident to the police on Seo's behalf.)

The second attack took place after Seo had returned to Senegal and had begun receiving almost daily death threats. Out of fear for his life and the lives of his family, Seo sent his wife and son to the United States to live with his father, who had been granted asylum some years before. Seo himself moved to the residence of a diplomatic friend for safety but was nevertheless injured, he said, when a jeep associated with the Liberian Consul General in Senegal crashed into his car on January 26, 2007. In an addendum to his asylum application, Seo claimed that the driver of the jeep, after crashing into Seo's car, told him: "[T]his was a joke. Wait until next week..." (Seo later testified that what the driver actually said was "you will see," in French.) As a result, Seo left Senegal for the United States four days later and, even then, not without incident. He claimed that the man who drove him to the airport on January 30, 2007, was attacked and brutally stabbed upon his return. Seo also claimed that, while living in Ivory Coast from 1993 to 1997, he was attacked on

two occasions by members of a group calling itself the Patriotic Youth of the Ivory Coast. The group targeted Seo because they falsely believed that he had received military training when he worked for the U.S. Army as a translator for the African Crisis Response Initiative (ACRI) in 1999. They also falsely believed that Seo was a spy for the U.S. Government who had helped foment the rebel movement that overthrew the government of the Ivory Coast in December of 1999. In order to punish Seo for these alleged crimes, they assaulted him, first in 1999 and then in 2002. In the second attack, which took place at Seo's home, Seo claimed that he was warned he would be killed if he remained in the house the next day. As a result, Seo and his family temporarily moved into the house of Andy Brooks, the Program Manager of the organization Save the Children, for whom Seo worked at the time. Seo claimed that the family was eventually "evacuated" from Ivory Coast to Senegal.

In his asylum application, Seo claimed that he feared that he would be tortured or killed by one of these groups if he returned to Liberia and requested asylum on behalf of himself, his wife, Mireille, and his son.

In April 2008, DHS commenced removal proceedings against Seo and his family, who appeared before an immigration judge and renewed their application for asylum, withholding of removal, and protection under the Convention Against Torture. The judge held a hearing, during which he heard testimony from Seo, Seo's cousin, Isaac Dweh, and Mireille Seo. After the conclusion of testimony, the immigration judge issued an oral decision in which he found that, although Dweh and Mireille Seo were credible witnesses, Seo himself was not. The immigration

judge also found that Seo had failed to provide sufficient corroborating evidence to establish the credibility of his claim. He concluded that Seo had not established either past persecution or a well-founded fear of future persecution and, accordingly, denied Seo's and his family's applications for asylum and withholding of removal.

The BIA affirmed the immigration judge's adverse credibility determination and found Seo and his family ineligible for asylum, withholding of removal, or protection under Convention Against Torture. Seo now seeks to overturn that decision.

## DISCUSSION

**Standard of Review**

"Our review of administrative asylum and withholding of removal eligibility determinations is limited to a deferential standard." *Allabani v. Gonzales*, 402 F.3d 668, 674 (6th Cir. 2005). When, as here, "the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). "To the extent the BIA adopted the immigration judge's reasoning, however, this Court also reviews the immigration judge's decision." *Id.*

"Questions of law are reviewed de novo, but substantial deference is given to the BIA's interpretation of the [Immigration and Nationality Act] and accompanying regulations." *Id.* "The

BIA's interpretation of the statute and regulations will be upheld unless the interpretation is 'arbitrary, capricious, or manifestly contrary to the statute.'" *Sad v. INS*, 246 F.3d 811, 815 (6th Cir. 2001) (quoting *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 844 (1984)). We review factual findings under a substantial-evidence standard, upholding the agency's determination "as long as it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Parlak v. Holder*, 578 F.3d 457, 462 (6th Cir. 2009) (internal citations omitted). "[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B))). This case is governed by the credibility standards established by the REAL ID Act of 2005. *See El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009) ("The credibility standards of the Act apply to applications for asylum, withholding of removal, or other relief from removal filed on or after May 11, 2005.").

**The Adverse Credibility Determination**

Seo contends that the BIA erred in affirming the immigration judge's adverse credibility determination because substantial evidence does not support it. The immigration judge concluded that Seo was not credible for three reasons. First, the judge found numerous inconsistencies between Seo's testimony at the hearing and his written asylum application, and between Seo's testimony at the hearing and the testimony of other witnesses, including both Seo's wife, Mireille, and his cousin, Isaac Dweh. Second, the judge noted that Seo was either "wholly non-response to the question[s]" asked of him, or "felt need to add a great deal of non-responsive information that plainly was intended only to enhance his asylum claim." Finally, the judge noted that some of Seo's testimony

was simply not believable. As an example of implausible testimony, the judge pointed to Seo's assertion that when he was attacked in Liberia in July 2006, he was beaten for 30 to 35 minutes without anyone interceding and without requiring hospitalization after the attack.

Seo contends that the inconsistencies in his testimony, and between his testimony and that of others, do not provide substantial evidence of his lack of credibility because they were either unimportant or reflect merely the differing views of the witnesses. He argues that what the immigration judge took to be his non-responsiveness at the hearing merely reflected his nervousness to be testifying before the court. He also argues that the immigration judge's conclusion that he was not credible is inconsistent with the judge's conclusion that his wife, who provided corroborating testimony, was credible. Finally, he argues that the judge misunderstood his replies and for that reason deemed portions of his testimony "implausible."

Seo is correct that, in several instances, the immigration judge misinterpreted Seo's testimony at the removal hearing and, for that reason, found it implausible. Seo did not in fact testify at the removal hearing that the men who attacked him in Liberia in 2006 beat him for 30 to 35 minutes, as the immigration judge asserted in his oral opinion. Instead, Seo testified that he was with his assailants for a total of 20 to 25 minutes and that this time estimate included the time it took to travel to the remote location where he was taken out of the car and beaten. At no point did Seo specify precisely how long the beating itself lasted. Nor does his description of the attack make it impossible to believe that he did not require hospitalization afterwards. Seo claimed that his assailants beat him with their fists while he was in the car and jammed a gun in his mouth, and that after they stopped

the car and got out, they continued to hit and kick him. The immigration judge's conclusion that

Seo's account of the attack is implausible does not therefore appear to be supported by substantial

evidence.

The immigration judge was also incorrect when he asserted that Mireille Seo's account of

the 2002 attack on their home in Ivory Coast conflicted with that of her husband. In his oral

testimony, Seo testified that, during the attack, his wife was forced by the attackers to strip naked.

The immigration judge stated in his ruling that Mireille Seo's testimony on this point contradicted

that of her husband's because, in her account of the attack, she failed to mention that she was forced

to disrobe. However, as the BIA noted in its order, Mireille Seo did testify that she was forced to

strip naked by the assailants. Her testimony therefore corroborates, rather than contradicts, that of

her husband.

It is difficult to conclude that these inconsistencies provide support for the immigration

judge's adverse credibility determination. *See Sarr v. Gonzales*, 485 F.3d 354, 360-61 (6th Cir.

2007) (disregarding immigration judge findings that "involved a misinterpretation of the evidence").

However, in affirming the immigration judge's adverse credibility determination, the BIA did not

rely upon the immigration judge's finding that Seo's account of the 2006 attack was implausible.

Nor did it rely upon the finding that Mireille Seo's wife's testimony contradicted Seo's testimony

with respect to her forced disrobing during the 2002 attack. Instead, the BIA relied upon four other

inconsistencies that the immigration judge identified in Seo's testimony, as well as the judge's

conclusion that Seo was a non-responsive witness who made "repeated attempts to expand upon his answers [in] an attempt to enhance his asylum claim."

Leaving aside the erroneous findings of the immigration judge, the question then becomes whether these four inconsistencies, when combined with the immigration judge's observations about Seo's demeanor at the removal hearing, provide substantial evidence for the agency's adverse credibility determination. The four inconsistencies which the BIA identified in Seo's testimony are: (1) Seo's failure to mention in his written asylum application what he and his wife both testified to during the removal hearing namely, that during the 2002 attack on their home in the Ivory Coast, Mireille Seo was forced to strip naked; (2) the inconsistency between Seo's assertion in both his written and oral testimony that he left Liberia in 1993 and his cousin Isaac Dweh's testimony that Seo left Liberia with him in 1990; (3) the inconsistency between Seo's assertion in his written asylum application that he went with his cousin to the Liberian police to report the July 2006 attack against him and his testimony at the removal hearing that his cousin in fact went to the police alone; and (4) the inconsistency in Seo's account of his employer's response to the death threats that Seo purportedly began receiving on an almost daily basis after he returned to Senegal from his trip to Liberia in 2006. Specifically, the BIA noted the inconsistency between Seo's assertion in his written application that "his employer made arrangements for him to relocate to a different home after he informed them [sic] of the threats" and Seo's testimony at the removal hearing that, after he "informed his employer about the threats. . . he was told by his employer that 'it was a Liberian issue' and not work related." "We review separately each of the . . . inconsistencies upon which the

IJ and BIA based the adverse credibility determination" to see if the agency's findings are supported by substantial evidence. *Abdurakhmanov v. Holder*, 666 F.3d 978, 982 (6th Cir. 2012).

The first inconsistency in Seo's testimony that the BIA identified provides little or no support for the agency's adverse credibility determination. Asylum applicants do not have to provide comprehensive detail in their written asylum claim to be considered credible. *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005) ("[T[he circumstances surrounding the application process do not often lend themselves to a perfectly complete and comprehensive recitation of an applicant's claim to asylum or withholding, and . . . holding applicants to such a standard is not only unrealistic but also unfair.") (quoting *Secaida-Rosales v. INS*, 331 F.3d 297, 308 (2d Cir. 2003)). As a result, "the mere failure of a petitioner to include every detail of an asylum claim in the application itself should not be considered fatal to a petitioner's request for relief." *Kaba v. Mukasey*, 546 F.3d 741, 749 (6th Cir. 2008). All that is required is that the application "contain at least some indication of the type of assertions that will be made in support of [the] claim." *Id.* For that reason, although omissions generally can serve as the basis of an adverse credibility finding, they are not definitive when they involve claims that are subsequently elucidated at the hearing     as was the case here.

The fourth inconsistency that the BIA identified in Seo's testimony also does not appear to provide support for its adverse credibility determination, because the BIA was mistaken in its reading of the record. Seo did not in fact claim in his asylum application that after he informed his employer in Senegal about the threats against him, "his employer made arrangements for him to relocate to a different home." What Seo in fact wrote in his application was that "[o]ut of fear for my life and

upon the advice of the Regional Security Officer of Save the Children Sweden . . . I moved to the residence of a diplomatic friend in Senegal for safety." Seo claimed, in other words, that an employee at Save the Children gave him advice about what to do in response to the threats against him. Nowhere in the application does Seo assert that anyone associated with Save the Children helped him move. Seo's written application is not therefore inconsistent with his testimony at the removal hearing that, when he told his employer about the threats against him, he was told that there was nothing Save the Children could do for him because the threats did not relate to Seo's work for the organization. Instead, Seo's oral testimony only confirmed what he asserted in his written application: that, out of fear for his life, he moved into the home of a friend who worked as a diplomat and, therefore, presumably had better security at home than Seo himself.

Nevertheless, the other two inconsistencies that the BIA identified as a basis for the adverse credibility determination do provide support for its finding that Seo is not credible, even though both of them are relatively inconsequential to Seo's asylum claim. Because Seo does not allege that he was persecuted either in Liberia or in Ivory Coast between 1990 and 1993, little turns on whether Seo left Liberia in 1990, as his cousin Isaac Dweh testified, or left in 1993, as he claimed in his written application and oral testimony. Similarly, little turns on whether Seo went with his cousin to the police station to report the attack against him in 2006, or whether the cousin went alone "on Seo's behalf." This inconsistency does not speak to the broader question of whether the attack itself did in fact occur. Neither of these inconsistencies, in other words, goes to the heart of Seo's asylum claim. However, because this case is governed by the credibility standards established by the REAL

ID Act of 2005, *see El-Moussa v. Holder*, 569 F.3d at 256, they can still serve as the basis of an

adverse credibility determination. The Act requires courts to look at the "totality of circumstances"

when making credibility determinations, and explicitly permits triers of fact to:

> . . . base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements . . . the internal consistency of each such statement, the consistency of such statements with other evidence of record . . . , and any inaccuracies or falsehoods in such statements, *without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor*.

8 U.S.C. § 1158(b)(1)(A)(iii) ((emphasis added).

Under the deferential standard of review that governs BIA credibility determinations, we

therefore affirm the BIA's adverse credibility determination. *See Alhaj v. Holder*, 576 F.3d 533,

537-538 (6th Cir. 2009) ("To overturn . . . a factual determination [of the BIA], 'we must find that

the evidence not only supports [a contrary] conclusion, but compels it.'" (quoting *INS v. Elias-*

*Zacarias*, 502 U.S. 478, 481 n.1 (1992)). The two inconsistencies identified above make it difficult

to argue that the evidence "compels" the panel to find Seo credible, particularly when combined with

the immigration judge's finding that Seo was a non-responsive and evasive witness, a determination

of demeanor that is virtually impossible to assess from a written transcript.

**The Corroborating Evidence Rulings**

Seo also argues that the BIA erred in affirming the immigration judge's conclusion that he failed to provide sufficient corroborating evidence to establish past persecution and a well-founded fear of future persecution. Under the REAL ID Act, "[t]he testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(ii). However, "[w]here the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence." *Id.* We will not "reverse a determination made by a trier of fact with respect to the availability of corroborating evidence, . . . unless [we find] that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4).

In this case, the immigration judge concluded that Seo did not provide sufficient evidence to corroborate the claims he made in his written application and at the hearing. Specifically, the judge noted the lack of: (1) a statement from the cousin, Emitte Doele, who picked Seo up after he was attacked in Liberia in 2006, helped get Seo medical treatment, and reported the attack to the police; (2) a statement from Doele's friend, Dinah Sateh, who provided Seo medical treatment after the attack; (3) a statement from the friend, Linus Sarkor, who drove him to Sierra Leone after the 2006 attack so that he could get further medical treatment; (4) a statement from Andy Brooks, Seo's

boss at Save the Children, with whom Seo and his family lived after the 2002 attack; (5) a letter from the driver who Seo claims was stabbed after he drove Seo to the airport in 2007; (6) a letter from Colonel Magba, the family friend with whom Seo met in Liberia in July 2006, the day before he was attacked by the three ersatz police officers.

Seo argues that, in finding that he failed to provide sufficient corroborating evidence, the immigration judge ignored the extensive corroborating evidence that he did provide. This evidence includes, most relevantly: a certificate from the U.S. military, demonstrating Seo's participation in the ACRI program in 1999; a letter from the security advisor at Save the Children in Ivory Coast, dated January 24, 2007, attesting to the serious threats that Seo had received "because of his active involvement in the political life of his community in Senegal"; a newspaper article, entitled "'Isakaba Boys'[1] Brutalise Former General's Relative," describing the attack against Seo that took place in Liberia in 2006; a letter from Andy Brooks, dated November 18, 2002, informing Seo of his relocation to the regional office in Dakar in response to his concerns about the security situation in Ivory Coast; two typewritten letters (the first signed by the "Isakaba Network," the second signed by "Concerned citizens, senegal"), warning Seo in English that "we do here by promise we will be meeting or escorting you very soon to your final destination" and that "You have signed your own death warrant"; and an affidavit from Seo's uncle, Moses Wright, a former general in the Liberian

---

[1]As Seo explained in his application, and during the removal hearing, "Isakaba Boys" is a term used to refer to the members of Charles Taylor's "death squad" who continue to operate in Liberia.

army, testifying to the persecution that Charles Taylor perpetrated against members of the Krahn people and the Liberian military during the Liberian civil war.

Seo also notes that the testimony of his wife Mireille (whom the immigration judge found to be a credible witnesses) corroborates significant portions of his testimony, including his account of the 2002 attack on his house in Liberia. He argues that the additional corroborating evidence that the judge required was not reasonably available and that his failure to procure it should not undermine the credibility of his asylum claim.

This argument is not completely without merit. As we have noted, "The corroborating evidence standard is typically invoked by [immigration judges] when the applicant has submitted little or no evidence to corroborate her testimony." *Abdurakhmanov*, 666 F.3d at 983. In this case, Seo submitted corroborating evidence, but the hearing judge questioned the authenticity of some of it, particularly the typewritten death threat that Seo submitted from the "Isakaba Network." The judge found it difficult to believe that "[t]he Issakaba network . . . would be polite and careful enough to indicate that the letter came from the Issakaba Network and to date it." Moreover, much of the evidence that Seo provided does not compel the conclusion that the immigration judge or BIA (which simply adopted the immigration judge's findings on this point) was wrong in concluding that Seo had not provided sufficient reasonably available corroborating evidence to sustain his burden of proof, because most of the evidence that Seo proffered did not supply independent corroboration of Seo's claims.

For example, the letter from Effeby Fall, the security advisor at Save the Children, appears at first glance to provide independent corroboration of Seo's claims that he was the subject of death threats in Senegal, as well as in Ivory Coast. The letter, addressed to "whom it may concern," speaks of "continuing persecution and threats against the person of our Regional Accountant [Jackson Seo] by opposition members of the Liberian community . . . in Senegal" and attests to the fact that "Seo was already victim of similar persecution in Ivory Coast which led to his transfer to Senegal." Nevertheless, the letter does not indicate how Fall came to learn of the threats made against Seo in Senegal or, for that matter, in Ivory Coast. In his application, Seo suggests that Fall knew about them because Seo *told* him they had occurred, which is the most obvious explanation but does not provide independent corroboration of Seo's claims.

Nor does the newspaper article reporting the 2006 attack provide clearly independent corroboration of Seo's claims. The article does include a picture of someone (presumably Seo) who appears badly beaten up and bandaged. However, the account it provides of how Seo came to be in this condition was obviously derived, either in whole or in substantial part, from interviews with Seo's relatives in Senegal. There is no evidence in the portion of the article available in the record that any of the information in the article was based on independent reporting.

The same is true of the letter from Andy Brooks, attesting to the fact that Seo was being relocated to the regional office in Dakar, Senegal, due to security concerns in Ivory Coast. The letter does not make clear how Brooks, or the organization generally, came to know of Seo's security situation. As the immigration judge noted at the hearing, it fails to reflect any personal knowledge

on Brooks's part of the threats against Seo and his family. Nor does it refer in any way to the fact that Seo and his family lived with Brooks for several weeks after the attack in 2002 that Seo describes in his asylum application. The immigration judge indicated at the hearing that he found suspicious the absence of any discussion in the Brooks letter of that incident. Suspicious or not, the fact that the letter does not refer to any events of which Brooks had personal knowledge undermines its usefulness as corroboration.

None of the other documentary evidence that Seo provided the immigration judge provides any corroboration of Seo's specific claims of persecution. And, although his wife's testimony corroborated his account of the 1999 and 2002 attacks on their home in Ivory Coast and was based on first-hand knowledge, her knowledge of the attack in 2006 was only second-hand, given that she was not in Liberia when the attack occurred. Taken all together, the evidence does not *compel* the conclusion that the immigration judge was wrong in finding that Seo had provided insufficient corroborating evidence to sustain his burden of proof.

Nor does the evidence compel the conclusion that the immigration judge erred in determining that additional corroborating evidence was "reasonably available." In this circuit, supporting documentation is reasonably available "if it is of the type that would normally be created or available in the particular country and is accessible to the alien, such as through friends, relatives, or co-workers.'" *Dorosh v. Ashcroft*, 398 F.3d 379, 382-384 (6th Cir. 2004) (internal quotations omitted). Seo argues that the letters from Doele, Sateh, Sarkor, Brooks, Magba, or the driver of his car were not reasonably available to him while he was living in Africa because he did not know that

he would later need them and, in the case of General Magba, feared making contact with him to ask for a letter because of suspicions that Magba was involved in the 2006 attack. Once in the United States, Seo claims, he lost contact with many of those individuals and such letters were therefore not "accessible" to him.

In terms of accessibility, we have suggested that statements from witnesses from whom the applicant has lost contact should not be considered reasonably available. *Lin v. Holder*, 565 F.3d 971, 977 (6th Cir. 2009) (assuming that "a reasonable trier of fact may conclude corroborating evidence is unavailable from" a witness with whom the applicant had lost contact). But, we have also held that corroborating statements from witnesses to the persecution that the petitioner describes in his asylum application are reasonably available when the petitioner remains in regular contact with those witnesses. *See Hachem v. Holder*, 656 F.3d 430, 434-35 (6th Cir. 2011) (affirming the BIA's finding that corroborating evidence from the applicant's girlfriend, mother, and father was "reasonably available" given applicant's testimony that he "had regular contact with his family members and his girlfriend").

Here, the fact that Seo lost contact with his cousin Emitte Doele, Doele's friend Sateh, Sarkor, or Andy Brooks means that a rational trier of fact could conclude that corroborating statements from them were not "reasonably available" to him. There is no evidence, however, that Seo had lost contact with Magba or did not know how to reach him, and it is unclear why Seo would fear contacting him from the United States. There is, furthermore, clear evidence that Seo had *not* lost contact with the driver of his car, who he claims was stabbed after dropping Seo off at the airport

in January 2007. Seo testified that he had spoken to the driver on the telephone after he left Senegal and, in that way, came to learn that he had been attacked.

We conclude, on the record before us, that the evidence does not compel us to hold that the immigration judge, or the BIA, was wrong in finding that Seo failed to provide reasonably available corroborating evidence of his claim.

**The Persecution Claims**

Finally, Seo challenges the immigration judge's decision that he failed to establish either past persecution or a well-founded fear of future persecution on which to base a grant of asylum, withholding of removal, or protection under the Convention Against Torture. However, "[the immigration judge's] credibility finding is fatal to all three of [Seo's] claims for relief." *El-Moussa*, 569 F.3d at 266. Indeed, an adverse credibility finding precludes an applicant from demonstrating either the well-founded fear of future persecution necessary to establish eligibility for asylum, or the "clear probability" of future persecution necessary to qualify for withholding of removal. *Id.* at 267. An adverse credibility finding also precludes relief under the torture convention. *Zhao v. Holder*, 569 F.3d 238, 249 (6th Cir. 2009).

## CONCLUSION

For the reasons set out above, we DENY the petition for review.