NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0492n.06

No. 21-3029

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

LEA JASEL JOLON-VELASQUEZ,                )
                                          )
    Petitioner,                           )
                                          )
v.                                        )
                                          )
MERRICK B. GARLAND, Attorney General,     )
                                          )
    Respondent.                           )
                                          )
                                          )
                                          )

**FILED**
Oct 28, 2021
DEBORAH S. HUNT, Clerk

ON PETITION FOR REVIEW
FROM THE BOARD OF
IMMIGRATION APPEALS

Before: CLAY, GIBBONS, and BUSH, Circuit Judges.

CLAY, Circuit Judge. Lea Jasel Jolon-Velasquez seeks review of a December 16, 2020, Board of Immigration Appeals ("BIA") decision dismissing her appeal of an immigration judge's ("IJ") October 26, 2018, decision denying her application for asylum, 8 U.S.C. § 1158; withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(b)(3); and protection under the Convention Against Torture ("CAT"), 8 C.F.R. § 208.16. Specifically, Jolon-Velasquez challenges the agency's adverse credibility determination. Because the agency's decision is supported by substantial evidence, we **DENY** the petition for review.

## BACKGROUND

Jolon-Velasquez is a citizen of Guatemala who entered the United States without inspection on July 7, 2011, near Del Rio, Texas. Upon entering the United States, she was detained in Taylor, Texas. On August 11, 2011, she met with an asylum officer who conducted a credible-

fear interview. The United States Citizenship and Immigration Services ("USCIS") initiated removal proceedings against her on August 12, 2011. On April 30, 2013, she filed an application seeking asylum and withholding of removal under both the INA and the CAT. Her application indicated that she feared returning to Guatemala based on her "[m]embership in a particular social group," (Asylum Appl., A.R. #243), consisting of "Guatemalan women in domestic relationships seen as property of their partner," (Pet'r Br. to BIA, A.R. #30). Specifically, she said that she feared returning to Guatemala because her ex-partner—Ramiro Perez-Carrera—had a history of domestic violence, and she was afraid Perez-Carrera would kill her if she returned.

In Guatemala, Jolon-Velasquez was in a common law marriage with Perez-Carrera.[1] She met Perez-Carrera in 1997. In her credible-fear interview, she said that the couple moved in together in April 1998. But in her testimony before the IJ, she said that they moved in together in December 1997. They had a son together in June 1998.

After they moved in together, Perez-Carrera began abusing Jolon-Velasquez. He would frequently beat her and lock her up. In one such incident, Perez-Carrera became angry after Jolon-Velasquez asked him to help care for their baby. He "grabbed [her] by the neck and he hit [her] head, threw [her] against the wall and he grabbed the baby." (Credible Fear Interview, A.R. #308). He then held her neck against the wall and hit her with one hand while holding their baby in the other. When Jolon-Velasquez finally got free, Perez-Carrera "grabbed [her] by the hair and dragged [her] into the room" where he "climbed on top of [her] and tried to choke [her]." (*Id.*)

---

[1] However, the record is not entirely clear on the marital status of Jolon-Velasquez and Perez-Carrera. Just before identifying Perez-Carrera as her common-law husband, Jolon-Velasquez marked her marital status as "[s]ingle." (Credible Fear Worksheet, A.R. #301). In her credible-fear interview, she stated that she was "[n]ot married, but in a free union" with Perez-Carrera. (Credible Fear Interview, A.R. #307). Moments later, she referred to Perez-Carrera as her "spouse." (*Id.*)

In another instance, Jolon-Velasquez asked Perez-Carrera to watch their son while she did laundry. After an hour, Perez-Carrera's mother came by to bring the baby back to Jolon-Velasquez. Shortly thereafter, Perez-Carrera came home from a sporting event intoxicated. Jolon-Velasquez—confused about why her mother-in-law was watching her son—asked Perez-Carrera what had happened. In response, he "punched [her] in the face," "grabbed [her] neck and pushed [her] head into the wall," "squeezed [her] stomach with his knee," "dragged [her] inside the house," and "kicked" her. (Jolon-Velasquez Aff., A.R. ##253–54). He proceeded to lock her inside of their home—which was on the second story of their building. Unable to escape, Jolon-Velasquez threw a note out of the second-story window to her downstairs neighbor, asking the neighbor to call her father. When her family arrived, they found Jolon-Velasquez trapped inside the house. When her family entered the house, they saw that Jolon-Velasquez had been beaten and was crying, and "she had bruises all over her back, her chest, and her thighs." (Sister's Letter, A.R. ##268–69).

When testifying before the IJ, Jolon-Velasquez said that this incident occurred in 2003. But her family members said that it happened on September 27, 1998. Jolon-Velasquez insisted that her family had the wrong date. But she also testified that her son was only three months old at the time—indicating that it was in the fall of 1998. When confronted with this discrepancy, she tried to clarify, stating that her son was three months old at the time of "the first incident that happened," but that at the time of this specific incident her "son was approximately five years or six years old, and it happened in 2003." (Jolon-Velasquez Test., A.R. #141). Both her mother and her sister reported going with her to file a police report after this incident. But Jolon-Velasquez stated that only her sister came with her.

In her credible-fear interview in 2011, Jolon-Velasquez reported that the first time Perez-Carrera abused her, she filed a complaint with the police, and they issued a restraining order. Although she said Perez-Carrera "threatened" her over the restraining order—saying "that if he ends up in jail when he gets out it will be worse for [her]"—she also said that he obeyed the order, which lasted for seven months. (Credible Fear Interview, A.R. #308). But later, testifying before the IJ, she reported that when Perez-Carrera found out about the police report, "he found [her] . . . and beat [her] up very hard." (Jolon-Velasquez Test., A.R. #116). She also testified that Perez-Carrera "didn't care about the order or any paper." (*Id.* at A.R. #134). When asked to clarify whether Perez-Carrera followed the restraining order, she said that "[h]e didn't really respect that order." (*Id.* at A.R. #151).

It is unclear from the record when the abuse ended and when Jolon-Velasquez left Perez-Carrera. In her credible-fear interview, she indicated that he last beat her and locked her up on December 16, 2009, and she told the asylum officer that she left Perez-Carrera on May 21, 2010. But when testifying before the IJ, she said that the last physical altercation between the two was in 2003 when she threw a note to her downstairs neighbor seeking help. Indeed, she was sure it was in 2003 because that incident was the last straw, and she left Perez-Carrera shortly thereafter. In a 2013 affidavit, Jolon-Velasquez said that the last time involved a situation where her neighbors called the police after she escaped and ran outside screaming and crying, but she later recanted this statement and said that there were "many other times" when he hit her after that incident. (*Id.* at A.R. #137). When confronted about these discrepancies, Jolon-Velasquez said that she "really do[esn't] remember every date every time that he hit [her]." (*Id.* at A.R. #138). However, she ultimately admitted that she lied to the asylum officer in her credible-fear interview when she said that she did not leave Perez-Carrera until May 2010. She said that she lied because she "thought

that if [she] said that it was something recent, [she] was not going to be sent back" to Guatemala. (*Id.* at A.R. #156).

After she left Perez-Carrera, Jolon-Velasquez moved in with her parents. Even after she left him, Perez-Carrera would follow her, waiting at her bus stop or at her work. When he saw her, he would grab her hair or arms and push her, leaving her with bruises. Because of these incidents, Jolon-Velasquez went into hiding with her sister and cousin. She quit her job and was "always changing places," because she was "afraid that he suddenly could find [her]." (Jolon-Velasquez Aff., A.R. #255).

Despite moving many times to avoid Perez-Carrera, Jolon-Velasquez, in her asylum application, only listed one address between 1983 and 2009; her parents' home. Her application did not list the address where she lived with Perez-Carrera between 1997 and 2003. Similarly, in three different U.S. visa applications between 2006 and 2009, she listed only her parents' address. When testifying before the IJ, she said that she did not list her address with Perez-Carrera because she did not know the address. But she was unsure why she did not simply mark "unknown address." (Jolon-Velasquez Test., A.R. #132). She later clarified, "[a]t the time, [she] was moving from place to place, but [she] always put the address of [her] parents because that was [her] mailing address to receive documents." (*Id.* at A.R. #145).

When she first entered the United States in July 2011, Jolon-Velasquez told a border patrol officer that she was not afraid to return to Guatemala and that she came to the United States to look for work. Later, in her credible-fear interview in August 2011, she said that she came to the United States because she feared that, if she looked for work back in Guatemala, Perez-Carrera would find her, kill her, and hurt their son. When asked about this discrepancy, she explained that

she "didn't believe that [she] could tell [Border Patrol] about the problem that [she] was having" or that she "was running away." (Credible Fear Interview, A.R. #310).

After a removal hearing in June 2017, the IJ issued a decision denying Jolon-Velasquez's requested relief and ordering her removal. The IJ found that Jolon-Velasquez was not credible. Based on that finding, the IJ denied all of her claims for relief because, without her own statements supporting her claims, she could not demonstrate that she was entitled to asylum or withholding of removal. Notwithstanding the adverse-credibility finding, the IJ determined that, even if Jolon-Velasquez were credible, she would not qualify for asylum. The IJ first concluded that she did not timely file her asylum application and that her tardiness was not excused by extraordinary or changed circumstances. The IJ nevertheless proceeded to the merits and concluded that Jolon-Velasquez had not sufficiently established that she had suffered past persecution,[2] that she faced any fear of future persecution, or that she was a member of a particular social group. Finally, the IJ concluded that she did not qualify for withholding of removal under either the INA or the CAT.

Jolon-Velasquez timely appealed to the BIA arguing that her asylum application was timely, she was credible, she was entitled to asylum, and she qualified for withholding of removal under both the INA and the CAT. The BIA affirmed the IJ's decision "for the reasons stated therein." (BIA Decision, A.R. #3). Despite affirming the IJ's decision in whole, the BIA focused primarily on the adverse credibility determination. It declined to consider the timeliness argument stating, "[w]e need not reach [Jolon-Velasquez's] arguments regarding whether her asylum application was timely filed as the [IJ]'s credibility finding is determinative of her asylum claim."

---

[2] The IJ's decision on "past persecution" rested on the credibility determination stating: "If she had been credible, the past harm certainly would have risen to the level of persecution." (IJ Decision, A.R. #85).

(*Id.* at A.R. #4).[3] Jolon-Velasquez now petitions this Court to review the BIA's decision. She argues that she is credible, that her asylum application was timely filed, and that she is entitled to asylum.[4]

**DISCUSSION**

**I.     Standard of Review**

"This court has jurisdiction to review a final order of removal from the BIA pursuant to 8 U.S.C. § 1252." *Marikasi v. Lynch*, 840 F.3d 281, 286 (6th Cir. 2016). "Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (citing *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007)). But "to the extent that the BIA adopted the immigration judge's reasoning, this court also reviews the immigration judge's decision." *Sanchez-Robles v. Lynch*, 808 F.3d 688, 692 (6th Cir. 2015) (citing *Khalili*, 557 F.3d at 435); *see also Slyusar v. Holder*, 740 F.3d 1068, 1072 (6th Cir. 2014) ("When the BIA adopts the IJ's reasoning and supplements the IJ's opinion, that opinion, as supplemented by the BIA, becomes the basis for review." (quoting *Zhao v. Holder*, 569 F.3d 238, 246 (6th Cir. 2009))).

We review the BIA's factual findings under a deferential "substantial evidence" standard. *Marikasi*, 840 F.3d at 286 (quoting *Abdurakhmanov v. Holder*, 735 F.3d 341, 345 (6th Cir. 2012)). "Credibility determinations are considered findings of fact, and are reviewed under the substantial evidence standard." *Id.* at 287 (quoting *Sylla v. I.N.S.*, 388 F.3d 924, 925 (6th Cir. 2004)). Under

---

[3] The BIA also found that Jolon-Velasquez waived any arguments concerning the denial of CAT relief because she had not meaningfully argued the issue on appeal.

[4] Jolon-Velasquez stated that her "fear of future persecution and her claims for withholding . . . are not raised on appeal[,]" (Pet'r Br. at 28 n.2), and thus are waived. *See United States v. Montgomery*, 998 F.3d 693, 697–98 (6th Cir. 2021).

this standard, "[a] reviewing court should not reverse simply because it is convinced that it would have decided the case differently." *Id.*; *see also* 8 U.S.C. § 1252(b)(4)(B) ("[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary. . . ."). Rather, "[r]eversal is warranted only when the evidence not only supports a contrary conclusion, but indeed *compels* it." *Juan Antonio v. Barr*, 959 F.3d 778, 788 (6th Cir. 2020) (internal quotation marks omitted) (emphasis in original) (quoting *Mandebvu v. Holder*, 755 F.3d 417, 424 (6th Cir. 2014)).

## II.    Analysis

The Attorney General has the authority to grant asylum to "refugee[s]." 8 U.S.C. § 1158(b). A "refugee" is a person "who is unable or unwilling to return to her home country because of past persecution or a 'well-founded fear' of future persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Moreno v. Sessions*, 694 F. App'x 391, 395 (6th Cir. 2017) (quoting *Umana-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013)). "To meet the definition of a refugee, a person must show that one of the aforementioned protected grounds 'was or will be at least one central reason for' h[er] persecution." *Bi Qing Zheng v. Lynch*, 819 F.3d 287, 294 (6th Cir. 2016) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). The burden is on the applicant to show that she meets these criteria. § 1158(b)(1)(B)(i); *Juan Antonio*, 959 F.3d at 789.

But before determining whether an applicant has met these criteria, an IJ must "make a threshold determination of the [applicant's] credibility." *Zhao*, 569 F.3d at 243 (citing *In re O–D–*, 21 I. & N. Dec. 1079 (BIA 1998)). "An adverse credibility finding is usually fatal to an applicant's ability to prove entitlement to asylum . . . ." *Luna-Romero v. Barr*, 949 F.3d 292, 294

(6th Cir. 2020) (quoting *Rubio-Mauricio v. Barr*, 782 F. App'x 444, 446 (6th Cir. 2019)).[5]  This

is for many reasons: because applicants bear the burden of proof to show that they are eligible for

asylum, because applicants commonly rely on their own testimony as their primary or sole source

of evidence, and because Courts of Appeals review credibility determinations under a highly

deferential standard.  *Id.* at 294–95.

Here, the IJ and BIA's adverse credibility determination is supported by substantial

evidence, and this finding is fatal to Jolon-Velasquez's claims for relief.  The REAL ID Act of

2005 governs credibility determinations in asylum and withholding of removal proceedings.

*Slyusar*, 740 F.3d at 1072.  The trier of fact—here, the IJ—is responsible for making credibility

determinations.  *See* 8 U.S.C. § 1158(b)(1)(B)(iii).  In making such a determination, the IJ may

consider the "totality of the circumstances, and all relevant factors," including:

> the demeanor, candor, or responsiveness of the applicant or witness, the inherent
> plausibility of the applicant's or witness's account, the consistency between the
> applicant's or witness's written and oral statements (whenever made and whether
> or not under oath, and considering the circumstances under which the statements
> were made), the internal consistency of each such statement, the consistency of
> such statements with other evidence of record (including the reports of the
> Department of State on country conditions), and any inaccuracies or falsehoods in
> such statements . . . .

*Id.*  Before 2005, IJs were limited to considering inconsistencies that "went to the heart of an

applicant's claim" when making credibility determinations.  *Slyusar*, 740 F.3d at 1072 (citing *Ren*

---

[5] In a handful of cases, this Court has concluded that an adverse credibility determination in *always* fatal to claims for asylum and withholding or removal.  *Slyusar*, 740 F.3d at 1074 ("[T]he IJ's adverse credibility determination was dispositive of [the petitioner's] application for asylum and withholding of removal."); *Moreno*, 694 F. App'x at 395 ("[A]n adverse credibility finding 'precludes an applicant from demonstrating either the well-founded fear of future persecution necessary to establish eligibility for asylum, or the "clear probability" of future persecution necessary for withholding of removal.'" (quoting *Seo v. Holder*, 533 F. App'x 605, 615 (6th Cir. 2013))).  We do not need to address this discrepancy because, in this case, the outcome is the same whether an adverse credibility finding *usually* or *always* precludes asylum and withholding of removal.

*v. Holder*, 648 F.3d 1079, 1084 (9th Cir. 2011)).  The REAL ID Act amended this standard so that an adverse credibility finding may be based on "any inaccuracies or falsehoods in [an applicant's] statements, without regard to whether an inconsistency, accuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor."  § 1158(b)(1)(B)(iii); *see also Luna-Romero*, 949 F.3d at 295 (comparing standards governing credibility determinations before and after the REAL ID Act).

Here, the BIA issued a separate opinion adopting the IJ's reasoning and expounding upon the adverse credibility determination.  The Court thus reviews the IJ decision, as supplemented by the BIA's decision, for substantial evidence.  *See Slyusar*, 740 F.3d at 1072 (quoting *Zhao*, 569 F.3d at 246).  Even under the substantial evidence standard, "on the scene credibility determination[s]" are entitled to "substantial leeway."  *Moreno*, 694 F. App'x at 396 (quoting *Ying Chen v. Holder*, 580 F. App'x 332, 338 (6th Cir. 2014)).

Simply put, Jolon-Velasquez asks us to ignore the REAL ID Act and apply a version of the law that has not governed since 2005.  She admits that "the record contains numerous inconsistencies," but she argues that the IJ's adverse finding is not supported by substantial evidence because "the central theme of [her] asylum claim . . . remained consistent."  (Pet'r Br. at 29).  But, under the REAL ID Act, "even ancillary inconsistencies in a petitioner's testimony support adverse credibility determinations."  *Zheng*, 819 F.3d at 295 (quoting *Slyusar*, 740 F.3d at 1073).

The IJ's decision noted numerous inconsistencies within Jolon-Velasquez's own accounts—including throughout her testimony, her affidavit, her asylum application, her credible-fear interview, and her interview with a border patrol officer upon entering the United States.  Her statements also conflicted with the letters from her family.  Specifically, the IJ noted

inconsistencies in Jolon-Velasquez's timeline of her past abuse. For example, while adamant it was 2003 when Perez-Carrera locked her inside and she passed a note to her neighbor seeking help, she also testified that her son was only three months old at the time—indicating that it happened in late 1998. This account also conflicts with her family's statements, which unanimously said that this incident happened in 1998. Based on these facts, the IJ noted that "in regard to one of the key incidents [of abuse] . . . she was inconsistent internally and with her supporting documents as to the date of the incident." (IJ Decision, A.R. #83). The IJ further noted discrepancies concerning who accompanied Jolon-Velasquez to file a police report after that key incident and about the recency of the alleged abuse. Finally, as the IJ noted, Jolon-Velasquez lied about the date she left Perez-Carrera in her credible-fear interview.

The BIA affirmed the IJ's adverse credibility determination, finding that there were inconsistencies concerning "when her ex-partner last physically abused her, how long a restraining order against her ex-partner was in place, who came with her when she filed a report against him, whether she rescinded her complaint against him, and how long they lived together." (BIA Decision, A.R. #4).

We have routinely upheld adverse-credibility determinations where similar inconsistencies were present. *See Slyusar*, 740 F.3d at 1073 (upholding an adverse credibility determination when the applicant's statements were inconsistent on issues such as her employment history, her entry date, and her marital history); *El-Moussa v. Holder*, 569 F.3d 250, 255 (6th Cir. 2009) (upholding an adverse credibility finding because, "while the IJ could have regarded the conflicts between [the petitioner's] account . . . and her co-worker's account as mere differences in memory, the evidence does not compel such a conclusion"). Indeed, Jolon-Velasquez does not cite a single

case in support of her argument that the IJ's credibility determination was not supported by substantial evidence.

However, when weighing these inconsistencies, we must be mindful of the reality that victims of sexual assault and domestic violence "may experience trouble recalling the precise details of the incident," *Moreno*, 694 F. App'x at 397, as Jolon-Velasquez claimed was the case here. But "misremembering the specifics of an incident is altogether different" from lying to an asylum officer to enhance the likelihood of being able to stay in the United States. *Id.* In this case, beyond the mere inconsistencies, there is no dispute that Jolon-Velasquez lied to the asylum officer during her credible-fear interview because she thought it would improve her chances of remaining in the United States.

Submitting "knowingly false" statements throughout the asylum application process "casts a serious shadow on an applicant's overall credibility." *Rubio-Mauricio*, 782 F. App'x at 447 (quoting *Sai Hua Liu v. Gonzales*, 239 F. App'x 687, 689 (2d Cir. 2007)). "While applicants should be encouraged to recant false statements and withdraw false applications, the agency is not required to overlook such falsies in making its ultimate [credibility] determination." *Id.* (quoting *Liu*, 239 F. App'x at 689). In *Rubio-Mauricio*, this Court upheld the adverse credibility determination because the applicant lied in her credible-fear interview out of "fear of going back to [her] country." *Id.*; *see also Luna-Romero*, 949 F.3d at 295–96 (upholding an adverse credibility determination because the petitioner initially lied about his criminal history on his application, failed to directly answer questions when testifying, and made inconsistent statements about his place of residence over the years). The same logic applies here. In her testimony, Jolon-Velasquez said that she left Perez-Carrera after he locked her inside their home, an incident she insisted occurred in 2003. But she previously told an asylum officer that she did not leave Perez-Carrera

until May 21, 2010, and that he had abused her as recently as December 16, 2009. She later admitted that she lied to the asylum officer because she "thought that if [she] said that it was something recent, [she] was not going to be sent back" to Guatemala. (Jolon-Velasquez Test., A.R. #156). Even if the IJ and the BIA could have weighed the totality of the circumstances to come to a different conclusion, the evidence does not *compel* a different ruling. *See Marikasi*, 840 F.3d at 287 ("[A]dverse credibility determinations[] are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" (quoting *Liti*, 411 F.3d at 636)).

This issue is dispositive, as this case "offers a textbook example of why adverse credibility findings are 'usually fatal'" to an applicant's claims for relief. *Luna-Romero*, 949 F.3d at 295 (quotation omitted). The only evidence supporting Jolon-Velasquez's application—aside from her own discredited statements—are letters from her family members describing certain instances of abuse. But Jolon-Velasquez "nowhere suggests that, without [her] own testimony, this other evidence would suffice" to establish her claims. *Id.* Without sufficient factual matter to support her claims, Jolon-Velasquez's petition for review fails.

Because the adverse credibility finding is fatal to her claims, we do not need to consider whether her asylum application was timely or whether her own accounts of the abuse, if taken as true, would otherwise support an asylum claim.

## CONCLUSION

For the reasons stated above, we **DENY** Jolon-Velasquez's petition for review.